**STANDARD OIL COMPANY OF TEXAS and Pasotex Pipe Line Company, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 18888.**

United States Court of Appeals Fifth Circuit.

Aug. 15, 1962.

122

J. C. Hutcheson, III, Houston, Tex., Thomas S. Milam, Lubbock, Tex., Louis A. Scott, El Paso, Tex., of counsel, Scott, Hulse, Marshall & Feuille, El Paso, Tex., Crenshaw, Dupree & Milam, Lubbock, Tex., Moulton A. Goodrum, Houston, Tex., Baker, Botts, Andrews & Shepherd, Houston, Tex., for appellants.

W. B. West, III, Barefoot Sanders, U. S. Attys., Fort Worth, Tex., for appellee.

Before JONES, BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by two corporate defendants, from fines imposed on judgments of conviction under the Connally Hot Oil Act,[1] raises this basic question. May a corporate employer be held liable for a crime committed by employees who, although ostensibly acting in the performance of their duties, were really cooperating with a third person in the accomplishment of a criminal purpose for the benefit of that third person, and whose acts not only did not benefit the employer, but in some instances, at least, result in a theft of its property? As to one count for failure to keep records,[2] there is a subsidiary question whether the indictment adequately alleged the element, as the statute prescribes, that this was done "knowingly."

The facts, as the trial Court sitting without a jury heard them, are indeed complicated and involved. This is pretty well indicated by the fact that in the excellent briefs which do credit to the case and their author-advocates, and which present these substantial legal questions to us in a way that avoids them being lost in a bewildering array of bold-faced points and counter points, points and counter points restated plus an unworkable index which it is our lot to struggle with too often, it takes twelve pages of solid nonargumentative statement in the appellants' brief plus three of the Government's to portray the factual detail which led to these convictions. Fortunately, we need not recite the facts in that detail for while they are complicated in many ways, they are surprisingly simple as to the crucial problem.

Standard and Pasotex[3] are corporate affiliates. Pasotex, a wholly owned subsidiary of Standard, is a common carrier by pipe line within Texas.[4] It maintained and operated an extensive gathering system in the Kelly-Snyder Field of Scurry County, Texas. Additionally, and primarily for account of Standard, it transported a very large quantity of oil from the Field to Standard's Refinery at

---

1. 15 U.S.C.A. § 715 et seq.

2. 15 U.S.C.A. § 715d and Title 30 CFR § 222.6.

3. Standard Oil Company of Texas, and Pasotex Pipe Line Company.

4. We do not reach the contention that transportation by Pasotex was not in interstate commerce.

El Paso from which substantial quantities of refined products subsequently moved in interstate commerce. All oil gathered and transported by Pasotex was handled under intrastate tariffs filed with the Railroad Commission of Texas, the regulatory agency for oil and gas matters in the State.

Standard's activities were even more comprehensive. The Kelly-Snyder Field, discovered in 1948, is a large field both in geographical area and in petroleum reserves. Covering an area of approximately five miles by seventeen miles, it included over 1300 wells. For conservation and operational efficiency, the Field was unitized into Segments 1, 2, and 3 of SACROC.[5] Standard as an owner of approximately 19% of the total production in the Unit was the operator of Segment 1, located in the northerly part of the Unit.

Because it is of importance later on, it is helpful to point out here that Segment 1 included the wells on the Jesse Brown Leases. Oil from Segment 1 moved through Pasotex Pumping Station No. 1. Pumping Station No. 1 is important because of the movement through it of oil from the Jesse Brown Leases into the main El Paso trunk line, and also because most of the oil gathered at Pumping Station No. 2 moved through Station No. 1 and thence into the El Paso trunk line. Pumping Station No. 2 was the collecting point for oil run from the Thompson Leases [6] through the gathering lines of Pasotex. Ultimately there

were nine Thompson wells. None of these leases was in the SACROC Unit. The wells were, therefore, operated wholly by Thompson's employees. The interest of Pasotex was limited to gathering and transportation of the Thompson oil. Standard's interest was limited to that of a purchaser having a statutory duty of buying oil tendered to it by Thompson and other producers in the field. § 8, Art. 6049a, Texas Rev.Civ. Stat.

It is in this setting that the plot was hatched, the minimum effect of which was to give Thompson credit for production in excess of that which some of his wells were making and, as to other phases, involved the actual misappropriation of large quantities of oil purchased by Standard from the Jesse Brown Segment 1 leases and for which Standard paid Thompson. Here individuals start to play the indispensable part to any corporate crime. The cast of characters includes Morgan, Ware and Purcell.[7]

The scheme was really very simple in origin and execution. Nothing was subtle. Thompson has nine wells. Some were capable of producing their daily allowable under rules of the Texas Railroad Commission. Some of them could not. But under the Texas Conservation Laws and Regulations, the underage from one lease may not be made up from other commonly owned leases which have a capacity in excess of their assigned allowables. Oil swapped in this fashion is most certainly hot oil under

5.  Shorthand for Scurry Area Canyon Reef Operators Committee.

6.  These were owned or operated by Claude J. Thompson, Inc., and two predecessor corporations, Thompson-Powell-Derrick Drilling Company and Thompson-Powell Drilling Company.

7.  Hart, who relieved Morgan, was also involved. He was a key witness and testified after an express grant of immunity by the Federal Petroleum Board. Ware, who was regularly employed by another major oil company (and never in the employment of Standard or Pasotex), was hired by Thompson to serve the Thompson wells as a pumper-switcher.

Morgan was the regular Pasotex gauger at Station No. 2. Ware, acting for Thompson, made a deal with Morgan by which he took over a portion of Ware's duties on the Thompson Leases. For these and other activities, Morgan (and to a lesser degree Hart and Purcell) received large payments of money and merchandise direct from Thompson or from Thompson through Ware. Rounding out the cast of characters was Purcell. Purcell was the gauger-foreman at Pumping Station No. 1. Actually he was substantially acting as superintendent during the prolonged absence of the regular superintendent Eckhart.

the Connally Act which, forbidding "the transportation in interstate commerce * * * of contraband oil * * *," 15 U.S.C.A. § 715b, defines this as "petroleum which, * * * was produced * * * or withdrawn * * * in excess of the amounts permitted to be produced * * * or withdrawn * * * under the laws of a State * * *," 15 U.S.C.A. § 715a(1).

Over a period of approximately twelve months, Morgan (or Hart as his relief) issued false run tickets covering oil supposedly received at Pumping Station No. 2 from or produced by specified Thompson wells. Some of these purported to show that the oil actually received (and receipted for) was produced by a given well rather than the one from which it was known by Morgan (or Hart) to have come. But in numerous other instances, a false run ticket was used showing receipt of Thompson oil which had never been produced or received at all. For rendering this vital and knowing participation in these two schemes which benefited Thompson, these two Pasotex employees were paid or received substantial sums in cash or merchandise from Thompson.[8]

In those instances where, though receipted for, no oil was actually received at Pumping Station No. 2, a new problem came up. Oil received at Station No. 2 moved to Station No. 1 where Purcell was in charge. But since Station No. 2 had less oil than it had receipted for, the shortage continued at Station No. 1 when No. 2 "moved" all of its oil to No. 1. This was an actual shortage of oil in contrast to mere swapping of oil among leases. This shortage had to be made up or the whole scheme would collapse.

This is where Standard becomes involved.[9] As operator of Segment 1 of SACROC, it operated all of the wells including those on the Jesse Brown leases. It therefore had control over the movement of the oil from the leases. More than that, by reason of the unitizing agreement Standard was an owner of a substantial undivided interest (approximately 19%) in all such oil. Purcell, aware of the continuing shortages from Station No. 2, gave instructions to pumpers to increase production from Segment 1 sufficient to make up the shortage. This amounted to 6,000 or so barrels every month for a considerable period. Records, of course, had to be falsified so that this "excess" oil moving through Station No. 1 to make up Station No. 2 "shortages" would be concealed. Standard had still another role. It was the purchaser of the oil. Since this make-up of Station No. 2 shortage was the only way Standard was getting oil ostensibly purchased earlier by it from Thompson at Station No. 2, Standard was, in effect, paying Thompson for oil which belonged to Standard (and the other Unit co-owners).

How Standard or Pasotex may be held criminally liable for "knowingly violating"[10] the statute by transportation of oil " * * * produced * * * in excess of the amounts permitted to be produced * * * under the laws of [the] state" of Texas when all of such oil came.

---

8. These transactions were covered by counts 1 through 8. Pasotex was named together with these individuals. Standard was not named in these counts.

9. This was the subject of counts 9 through 15 charging Standard and Pasotex, Purcell and other individuals. Only as to two of them, counts 11 and 12, did the Court find evidence sufficient to hold the corporate defendants guilty. Each challenges the sufficiency of the evidence to show that this was oil "produced * * * in excess of the amounts permitted to be produced * * * under the laws of such State * * *." 15 U.S.C.A. §

715b. In view of our disposition, we do not reach this. Our decision assumes, as the Government contends, that this was hot oil.

10. The penal provisions of the Connally Act are found in § 715c:
"Any person knowingly violating any provision of this chapter or any regulation prescribed thereunder shall upon conviction be punished by a fine of not to exceed $2,000 or by imprisonment for not to exceed six months, or by both such fine and imprisonment." 15 U.S.C.A. §. 715e.

into the custody of each corporation solely as a result of a deliberate purpose by unfaithful employees to cheat or steal is the legal question for our determination. Adding irony to what some might regard as amazement is the fact that the very first moment knowledge of this activity came to light, Pasotex, after preliminary verification of its suspicions, reported the matter immediately to the Texas Railroad Commission. Thereafter followed this prosecution.

■ We start with the proposition that what is involved is statutory construction. We may assume that Congress can subject corporations to criminal accountability for acts of this kind committed by unfaithful servants. But the question is whether any such purpose was intended with regard to the Connally Hot Oil Act.

Since the record is absolutely barren of even the most remote whisper of suspicion that this was the case of corporations winking at dereliction by energetic, zealous employees, the Government stresses, for both a legal and psychological purpose, the contention that the two corporations received some benefit. But as we point out later, no benefit was either intended or obtained.

We have some difficulty in understanding the contentions which the Government makes in its effort to support the District Court's finding of guilt which, in turn, was based almost wholly on the idea that what these unfaithful agents were doing was their usual function for the corporation. Underlying its thesis is, first, a complete misunderstanding of the conceptual theory of the defense, second, a disregard of the terms of this particular statute, and, third, a failure to distinguish between what Congress may do rather than what Congress has done.

Thus, as to the first, the Government's brief states that the corporate defendants claim that " * * * a corporation is not criminally liable for the acts of its employees, *within the scope of their employment,* (1) where intent is an element of the offense and (2) the acts are those of a subordinate employee, (3) acting contrary to orders (4) except in a case where the corporation actually benefits from the unlawful conduct in question." This, the corporate defendants point out, "assumes the critical question of scope of employment" and more than that it is "a gross misstatement" of their position. "That position," they then state, "is * * * simply that in a prosecution where knowledge is an element of the offense, a corporation cannot be charged with guilty knowledge acquired by employees outside the scope of their employment * * *." And, they continue, " * * * a servant is not acting within the scope of his employment unless his acts are motivated by a purpose to benefit the master or, as expressed in some of the decisions, to further the master's business." For reasons later discussed, we think this position is sound.

■ As to the second and third, it is readily evident that the two are closely allied. Thus, as to the third, it is perfectly clear that Congress may in certain areas impose criminal liability on a corporation for the mere doing of the proscribed act wholly unrelated to knowledge, actual or constructive. Application of this is found in the so-called public welfare crimes, such as distribution of harmful drugs, narcotics, etc., where injury to the public interest comes from the act or thing quite without regard to the antecedent circumstances, motivation or conduct. United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48; United States v. Balint, 1922, 258 U.S. 250, 42 S.Ct. 301, 66 L. Ed. 604; United States v. Behrman, 1922, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619; United States v. Parfait Powder Puff Co., 7 Cir., 1947, 163 F.2d 1008.[11]

11. Somewhat akin to these will be statutes imposing an affirmative duty to take action as distinguished from a prohibitory statute. The corporation is criminally liable because through no servant has it taken the required action. See, e. g.,

But under such statutes the act is flatly prohibited whether done "knowingly" or "willfully" or not. In none of the decided cases so far has the statute under review made knowledge an element of the offense. Of them the Supreme Court has declared, "The Balint and Behrman offenses belong to a category of another character, with very different antecedents and origins. The crimes there involved depend on no mental element but consist only of forbidden acts or omissions." Morissette v. United States, 1952, 342 U.S. 246, 252–253, 72 S.Ct. 240, 96 L.Ed. 288.

■ This brings us face-to-face with the second error in the Government's argument for here the statute expressly requires that the forbidden act be knowingly done. It punishes only persons "knowingly violating" the statute or regulations, § 715e, note 10, supra. In the final analysis, then, the Government's contention means that since Congress constitutionally make make knowledge unessential, it must be assumed that this was intended even though congressional terminology used traditional language to describe some mental element. This would turn the tables on the celebrated Morissette case, supra, 342 U.S. 246, 72 S.Ct. 240, in which the question was whether, in the *absence* of words similar to "knowledge," "willfully," etc., Congress nonetheless intended that a mental consciousness of doing some act was to be read into the statute. Courts may, therefore, by construction import into a statute the element of knowledge. To do so is to recognize that the " * * * existence of *mens rea* is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." Dennis v. United States, 1951, 341 U.S. 494, 500, 71 S.Ct. 857, 95 L.Ed 1137.

■ But the circumstances would be rare indeed where a court, construing a criminal statute, could read out the word "knowingly" (see note 10, supra). "The spirit of the doctrine which denies to the federal judiciary power to create crimes forthrightly admonishes that we should not enlarge the reach of enacted crimes by constituting them from anything less than the incriminating components contemplated by the words used in the statute. And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240.

As this statute prescribes a mental state as an element of the crime, usual principles must be applied in order to impute to the lifeless legal entity the requisite knowledge. So far as this case is concerned, we do not have to deal with the difficult and troublesome problem of determining whether the "knowledge" required is merely of the actions which constitute the crime as is true of some offenses, or whether it requires the so-called "evil intent," that is a consciousness that the actions taken violate a known law.[12] We may assume that the standard is the less exacting one and is satisfied if the evidence shows beyond a reasonable doubt that the acts were done " * * * deliberately and with knowledge * * * " and were " * * * not * * * merely careless or negli-

United States v. Illinois Central R. Co., 1938, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (failure to care for livestock during transportation, 45 U.S.C.A. §§ 71–74).

12. The alternative interpretations are discussed at length in McBride v. United States, 5 Cir., 1955, 225 F.2d 249, 253–255; many of the cases are catalogued in Roe v. United States, 5 Cir., 1961, 287 F.2d 435, 441–42, notes 11–14, as are those from this Court in United States v. DeWitt, 5 Cir., 1959, 265 F.2d 393, 402–404 (dissenting opinion).

gent or inadvertent. * * *" Browder v. United States, 1941, 312 U.S. 335, 341, 61 S.Ct. 599, 85 L.Ed. 862.

█ The corporations can be found guilty, therefore, only if the evidence shows that each, acting through its human agents, deliberately did these acts, that is, with the corporation "knowing" that they were being done for it. Inquiry along this line brings us face-to-face with the everyday problem of imputing knowledge to a corporation.

█ As these defendants here are the first to acknowledge, several things afford no insulation from corporate knowledge. Thus, no contention is made that "knowledge" can be acquired only through supervisory or executive personnel. On the contrary, while status of the actor in the corporate hierarchy might well have decisive significance in determining the question we later discuss concerning the intention to benefit the corporation, the corporation may be criminally bound by the acts of subordinate, even menial, employees. United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798, cert. denied, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639; United States v. Steiner Plastics Manufacturing Co., 2 Cir., 1956, 231 F.2d 149, 153; United States v. E. Brooke Matlack, Inc., D.Md., 1957, 149 F.Supp. 814. Likewise, no contention is, or can at this late date, be made that mere violation of instructions would shield the corporation from criminal responsibility for actions which its agents have taken for it. United States v. Armour & Co., 3 Cir., 1947, 168 F.2d 342, 344; People on Complaint of Price v. Sheffield Farms-Slawson-Decher Co., 225 N.Y. 25, 121 N.E. 474; United States v. E. Brooke Matlack, Inc., supra.

█ These results are certainly not startling. They are a part of the law of respondeat superior and accepted as established principles in civil tort situations. They are a recognition that law as a useful tool must accommodate pure theoretical logic to the demands of common sense. Consequently, while it was perhaps long in coming, it is now almost ancient law that despite these conceptual, logical difficulties, a corporation acting through human agents has the legal capacity to do wrong as well as right. It is a logical paradox that this creature of the law—the corporate entity—is created by law with the power to violate law. Nevertheless this has been the holding in the federal system since 1909 when the Court decided New York Central & H. R. R. Co. v. United States, 1909, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613. Of course those theoretic difficulties had for a time plagued the law in civil liabilities as well, but by applying usual principles of agency, the law had long recognized that the corporation would have a civil responsibility for injuries or wrongs done by those acting in the course and scope of their employment. Indeed, in going "only a step farther" to hold the corporation criminally liable for "the act of the agent [done] while exercising the authority delegated to him * * *" was merely "applying the principle governing civil liability * * *." New York Central & H. R. R. Co. v. United States, supra, 212 U.S. 481, 494, 29 S.Ct. 304.

In the very context of this decisive holding of criminal liability, those governing principles of civil liability were made equally clear. Civil liability is imposed on the corporation, the Court said, "when the act is done by the agent in the course of his employment, although done wantonly or recklessly or against the express orders of the principal. In such cases the liability is not imputed because the principal actually participates in the malice or fraud, but because the act is done for the benefit of the principal, while the agent is acting within the scope of his employment in the business of the principal * * *." 212 U.S. 481, 493, 29 S.Ct. 304.

And even more recently the Court, in recognizing that Congress has the power to "personify the company" and thereby charge a partnership entity with criminal liability, spelled out that it was "through the doctrine of respondeat su-

**128**

perior" that "corporations and other * * * impersonal entities can be guilty of 'knowing' or 'willful' violations of regulatory statutes * * *." United States v. A. & P. Trucking Co., 1958, 358 U.S. 121, 79 S.Ct. 203, 3 L.Ed.2d 165. And again the rationale is couched in the familiar concepts of civil tort law of (1) a purpose to benefit the corporation and (2) an act by an agent in line of his duties. "The treasury of the business may not with impunity obtain the fruits of violations which are committed knowingly by agents of the entity in the scope of their employment." 358 U.S. 126, 79 S.Ct. 203.[13]

■ Of course the defendants do not contend, nor could they, that criminal accountability and actual benefit are equated. There have been many cases, and there may well be others in the future, in which the corporation is criminally liable even though no benefit has been received in fact. But while benefit is not essential in terms of result, the purpose to benefit the corporation is decisive in terms of equating the agent's action with that of the corporation. For it is an elementary principle of agency that "an act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." Restatement of the Law of Agency (2d) § 235.[14]

■ It is for this reason that the simple "function" test applied by the District Court—while obviously a factor of relevance—is alone insufficient upon which to rest convictions here.[15] Thus the taking in or paying out of money by a bank teller, while certainly one of his regular functions, would hardly cast the corporation for criminal liability if in such "handling" the faithless employee was pocketing the funds as an embezzler or handing them over to a confederate under some ruse.

■ In reaching this conclusion, we do not find ourselves opposed to the 4th Circuit's decision in Old Monastery Co. v. United States, 4 Cir., 1945, 147 F.2d 905, cert. denied, 326 U.S. 734, 66 S.Ct. 44, 90 L.Ed. 437, or the 7th Circuit's reliance on it in United States v. Empire Packing Co., 7 Cir., 1949, 174 F.2d 16. The 4th Circuit rejecting the contention that there could be no criminal liability because the evidence demonstrated that the agent's acts were detrimental, not beneficial, to the corporation declared: "We do not accept benefit as a touchstone of corporate criminal liability; benefit, at best, is an evidential, not an operative fact." 147 F.2d 905, 908. We agree that benefit is evidential in determining the purpose and motive for which the agent does the act in question. If it is done with a view of furthering the master's business, of doing something for the master, then the expectation or hope of a benefit, whether direct or indirect, makes the act that of the principal. The act is no less the principal's if from such intended conduct

13. Other expressions of the essential element of an intended purpose to benefit the corporation—that is, to advance its interests—are found in Egan v. United States, 8 Cir., 1943, 137 F.2d 369, 379, cert. denied, 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474; United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798, 801.

14. And see especially comment a following this: "The rule stated in this Section applies although the servant would be authorized to do the very act done if it were done for the purpose of serving the master, and although outwardly the act appears to be done on the master's account. It is the state of the servant's mind which is material. Its external manifestations are important only as evidence. Conduct is within the scope of employment only if the servant is actuated to some extent by an intent to serve his master."

15. The District Court applied the "function" test as the sole determinant. In its memorandum decision the Court stated. "The test, in deciding whether the conduct and knowledge of these employees should be imputed to the employer, does not turn on action consistent with or contrary to company policy, but instead *the touchstone is the function of the employee.*" (emphasis added).

either no benefit accrues, a benefit is un-discernible, or, for that matter, the result turns out to be adverse.

On the facts of this record, only the most hypercritical, artificial view would find any benefit intended by the actions of Morgan, Hart or Purcell. As to oil from SACROC's Segment No. 1, this was taking Standard's oil and giving it to Thompson. Standard's oil was either stolen from it or it was, through these faithless agents, compelled to pay twice for oil supposedly purchased by it from Thompson. While the matter is not a spectacular theft as to Pasotex, it is equally positive that no benefit was conferred, nor, as the critical thing, was one intended by the actions taken at Pumping Station No. 2 by Hart and Morgan. They were not interested in doing Pasotex's work. As ostensible employees of Pasotex, they were each in the secret pay of Thompson for the purpose of assisting him in violating Texas (and hence federal) law through the movement and sale of oil produced in violation of applicable Texas statutes and regulations. Their purpose was to aid Thompson in his criminal enterprise. Of course it could not succeed for Thompson unless, through these false run tickets, the oil could be channeled into legitimate commercial transportation facilities. Without Pasotex and its pipeline transportation, and without Standard's purchase of such "hot" or non-existent oil, Thompson could not succeed. But Hart and Morgan were doing their usual tasks in handling run tickets not to advance or further the interest of Pasotex. This was done to further the criminal enterprise of which they were an indispensable part.

Hart and Morgan and Purcell each knew what he did and what he was doing. But to say that acts done by servants actuated by such evil and specifically unlawful motives were the acts of the very corporations thus sought to be cheated or implicated in practices known to be in serious violation of law and, moreover, to impute not only accountability but "knowledge" of such acts to the corporations, would be to disregard every accepted notion of respondeat superior. For these corporations to be found guilty of violating the Connally Hot Oil Act we may assume that it is not necessary to prove that through imputation each corporation consciously knew that the acts being done were in violation of the law. But to subject these corporations to criminal accountability it was necessary on accepted principles of imputation for each to know that these acts of Morgan, Hart and Purcell were being done. Under a statute requiring that there be "a specific wrongful intent," [16] and the "presence of culpable intent as a necessary element of the offense * * *," [17] the corporation does not acquire that knowledge or possess the requisite "state of mind essential for responsibility," [18] through the activities of unfaithful servants whose conduct was undertaken to advance the interests of parties other than their corporate employer. [19]

16. United States v. Boyce Motor Lines, 3 Cir., 1951, 188 F.2d 889, 891.

17. Boyce Motor Lines v. United States, 1952, 342 U.S. 337, 342, 72 S.Ct. 329, 96 L.Ed. 367.

18. United States v. Chicago Express, Inc., 7 Cir., 1956, 235 F.2d 785, 786.

19. None of the following cases pressed so vigorously by the Government are contrary to the result which we reach. United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798; United States v. Capitol Meats, Inc., 2 Cir., 1948, 166 F.2d 537; United States v. Steiner Plastic Manufacturing Co., 2 Cir., 1956, 231 F.2d 149; Mininsohn v. United States, 3 Cir., 1939, 101 F.2d 477; United States v. Armour & Co., 3 Cir., 1947, 168 F.2d 342; Zito v. United States, 7 Cir., 1933, 64 F.2d 772; C. I. T. Corp. v. United States, 9 Cir., 1945, 150 F.2d 85; Egan v. United States, 8 Cir., 1943, 137 F.2d 369; United States v. Gunn, W.D.Ark., 1950, 97 F.Supp. 476; United States v. E. Brooke Matlack, Inc., D.Md., 1957, 149 F.Supp. 814. In each of them the corporate agent, whether a mere employee or, as in most cases, a high ranking executive, intended that the corporation benefit through the production of business furthered by the action in controversy.

Consequently, the Court ought to have entered a judgment of acquittal on these counts, and the judgments must be reversed and here rendered.

As to Count 16, we need not examine the sufficiency of the evidence since we agree with the corporate defendants that the indictment does not charge the commission of an offense under the Connally Act.[20] The attack by the corporate defendants is that this indictment does not allege that the failure to comply with § 222.6 was knowingly done.

■■ We sustain the defendants' attack, not because the word "knowingly" or a specific synonym of it is absent from the indictment. See Glenn v. United States, 5 Cir., 1962, 303 F.2d 536. We do so on the ground that neither by express terminology nor by the facts otherwise appearing in the indictment is the critical element of a knowing violation set forth. United States v. Chicago Express, 7 Cir., 1956, 235 F.2d 785, 786; United States v. Boyce Motor Lines, 3 Cir., 1951, 188 F.2d 889, 890; Boyce Motor Lines v. United States, 1952, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367; St. Johnsbury Trucking Co. v. United States, 1 Cir., 1955, 220 F.2d 393. On the contrary, the indictment used precise language which covers conduct regarded by the law as something quite different. The indictment, note 20, supra, charged that the defendants "did fail and neglect to keep complete" records. But as we pointed out in McBride v. United States, 5 Cir., 1955, 225 F.2d 249, 253–55, in our quotation from Browder v. United States, supra, 312 U.S. 335, 341, 61 S.Ct. 599, terms such as willful and knowingly are to be taken as meaning "deliberately and with knowledge." This was,

the Court continued, in contrast to "something which is merely careless or negligent or inadvertent." Acts of omission or commission might well be attributable to the corporate defendants as a careless or negligent or inadvertent act without, at the same time, satisfying the more rigorous standard of those deliberately done with knowledge by agents in the course of employment.

■ Nothing in the remainder of the indictment gives meaning to "fail and neglect" other than the usual connotation which those terms have in the law. If the absence of records, or their inaccuracy was a deliberate thing and with knowledge by the corporations that this was so, such "failure and neglect" might satisfy the demands of § 715e. But if, on the other hand, the absence of records or their inaccuracies were the result of a simple failure to exercise care and caution in the setting up and maintenance of adequate records, it would not meet the statutory standard that the regulations be "knowingly" violated. While it is true that indictments are to be construed in a common sense way, where one is subject equally to one of two interpretations, one of which states an offense and the other which does not, the indictment is insufficient since there is no assurance that the Grand Jury would have returned the indictment had the words been employed in the sense necessary to sustain the conviction. Smith v. United States, 1959, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041; Beitel & Brownrigg v. United States, 5 Cir., 1962, 306 F.2d 665, emphasizing Russell v. United States, 1962, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240.

20. Count 16 charged:

"That from * * * November, 1955, until * * * May, 1956, Standard * * * Pasotex * * * Morgan and * * * Purcell * * * *did fail and neglect* to keep complete and accurate records and reports correctly reflecting the facts with respect to operations of * * * Standard * * * on the * * * leases in Segment No. 1, SACROC Unit * * * as required un-

der the provisions of Title 15, U.S.C. Section 715(d) and Title 30, C.F.R. Section 222.6." (emphasis added)

Records required to be kept by producers, refiners and pipelines are specified in 30 C.F.R. § 222.6.

Violation of regulations, as with the substantive provisions of the Connally Hot Oil Act itself, are covered under § 715(e), note 10, supra.

Count 16 was therefore subject to a dismissal for failure to state an offense.

As to all counts, therefore, the judgments of conviction as to the corporate defendants must be reversed and rendered in favor of the appellants.

Reversed and rendered.

Kaufman, Circuit Judge, dissented.