**RISS & COMPANY, Inc., Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

No. 16005.

United States Court of Appeals
Eighth Circuit.

Dec. 31, 1958.

Lester M. Bridgeman, Washington, D. C. (A. Alvis Layne, Jr., Washington, D. C., John L. Harlan, St. Louis, Mo., and Ivan E. Moody, Kansas City, Mo., were with him on the brief), for appellant.

Harry F. Horak, Atty., Interstate Commerce Commission, Kansas City, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., was with him on the brief), for appellee.

Before JOHNSEN, VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

Pursuant to authority of § 204(a) of the Interstate Commerce Act, as amended 49 Stat. 546, 49 U.S.C.A. § 304(a), the Interstate Commerce Commission promulgated certain motor carrier safety regulations. Section 195.4 thereof, 49 C.F.R. § 195.4 (1949 Ed., 1952 Sup.) dealing with maximum driving time for operators of motor carriers subject to the act, provides that except under conditions with which we are not here concerned, "no carrier * * * shall permit or require a driver employed or used by it to drive or operate for more than 10 hours in the aggregate in any period of 24 consecutive hours, unless such driver be off duty for 8 consecutive hours during or immediately following the 10 hours aggregate driving and within said period of 24 consecutive hours * * *."

Section 222(a) of the Interstate Commerce Act, supra [49 U.S.C.A. § 322(a)], provides that: "(a)ny person knowingly and willfully violating any provision of this [chapter], or any rule, regulation * * * thereunder * * * for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense * * *." [1]

An information containing twenty counts was filed by the Government against Riss & Company, Inc. The first count charged that "(o)n or about September 28, 1956, defendant, a common carrier by motor vehicle, did knowingly and wilfully permit and require James Tindall, a driver in its employ, to operate a motor vehicle engaged in the transportation of property from St. Louis, Missouri, to Cincinnati, Ohio, for more than 10 hours in the aggregate, to wit, 13 hours, in the period of 24 consecutive hours beginning at 12:01 a. m. on the 28th day of September, 1956, without said driver being off duty for 8 consecutive hours during or immediately following 10 hours aggregate driving and operating in said period of 24 consecutive hours." The remaining counts were similar in substance, differing only in date, name of driver; in some instances, the point of origin and destination and the number of excess driving hours. The date of the last alleged violation was January 31, 1957.

The case was tried without a jury, and in due time, the Court found the defendant guilty on fourteen counts and not guilty on two counts of the information, and a fine aggregating $3,350 was duly imposed. The Government dismissed as to four of the counts. Defendant has appealed, and for its basic point strenuously insists that the judgment of conviction cannot stand because the evidence

---

1. Subsequent to violations here involved, amended August 14, 1957, to increase penalties to "not less than $100 nor more than $500 for the first offense and not less than $200 nor more than $500 for any subsequent offense." Pub.L. 85–135, 71 Stat. 352, § 4.

does not establish beyond a reasonable doubt that the defendant has knowingly and willfully violated known regulations of the Interstate Commerce Commission. More precisely, it is urged that the record does not support a finding that the Government proved beyond a reasonable doubt that defendant's course of conduct was such as to establish that it willfully neglected to take proper precaution to prevent excess driving time violations. We are unable to agree and conclude that there was ample evidence to justify the verdict and judgment.

In an effort to dissipate the essential elements of "knowingly and willfully," defendant places much emphasis on the evidence which established beyond doubt that it had in effect, during the period of violations, an elaborate and comprehensive program designed to insure compliance with all regulations of the Interstate Commerce Commission, generally, and the regulation restricting driving time in particular. A detailed resumé of the evidence on this phase of the case is unnecessary to a solution of the basic issue. Briefly, the program was under the supervision of a Director of Safety and Personnel, whose functions included over-all supervision of the driving and duty hours of drivers; defendant had a "Master Driver Program" under which 18 of its best drivers were sent to the University of Kansas for a week of instruction in driver-training and ICC regulations; it conducted a continuing program of driver-training and instruction in ICC and company regulations; it had a driver supervisor at every terminal at which the drivers were based (in this case, St. Louis, Missouri); defendant operated its own safety patrol cars on the highways, and the patrol car operators would stop drivers on the road and check their equipment and log books; defendant also utilized services of a similar patrol service provided by an independent company; and it also had in effect a safety incentive award program whereby drivers without safety violations are given "points" toward acquisition of various items of merchandise.

Under ICC and company regulations, defendant's drivers were required to, and, in fact, did turn in daily their logs to their home terminal. Under the plan and program of defendant, it was contemplated that the following procedure would be pursued by its employees with respect to drivers' daily logs. The driver supervisor stationed at the St. Louis terminal would pick up all drivers' logs each morning and present them to the terminal log clerk who, during the period here involved, was Mrs. Jane Rulon. It was Mrs. Rulon's duty to check all logs for violations of on duty hours, and excess driving time violations, and to make report thereof to the driver supervisor. She was also required to record on a form designated as SP-26 all violations appearing on the logs, and forward said form daily to the defendant's headquarters in Kansas City, Missouri, where they would be examined and checked for violations. When the driver supervisor was informed of an infraction of the regulations, he would discuss it with the driver personally, if he was available, or would notify the driver by letter that he had been in violation, and he also issued formal reprimands or instructions. The drivers' logs would remain in the home terminal for ten or fifteen days following the month in which they were filed, and they were then sent to the Kansas City office, where they were available for inspection.

Directing attention to the instant violations, it should be said at the outset that defendant concedes that the evidence establishes that its involved drivers not only reported their on-duty time and driving hours on the logs which were turned in at the St. Louis terminal when each round trip was completed, but that said logs revealed the drivers drove more than ten hours in the aggregate, in a twenty-four hour period, without being off duty for eight consecutive hours during or immediately following the driving period. For some reason not apparent from the record, Mrs. Rulon failed to report the excess driving time to the driver supervisor or to the St. Louis

terminal manager, neither did she record the violations on the form which she forwarded daily to the Kansas City office. The log clerk in the personnel and safety department, stationed in Kansas City, handled daily drivers' logs sent to Kansas City from all terminals. He would check the logs "day by day for errors in construction," but never checked the logs against the SP-26 forms to determine whether all violations were being reported thereon. According to their testimony, none of the employees of defendant charged with the responsibility of handling the drivers' logs or reports based thereon, including the St. Louis terminal manager, the log clerk in the personnel and safety department, the over-all director of safety and personnel, the driver supervisor at the St. Louis terminal, and the office manager at the St. Louis terminal, acquired actual notice of the violations by the drivers until at, or subsequent to the time of filing of the information in this case.

 Contentions, similar to that here advanced by defendant, have received judicial consideration in cases where the involved statute forming the basis for the prosecution or recovery of penalty used the words "knowingly and willfully." From decisional law, the principle emerged that determination of the meaning of those words rested upon the character of the offense charged. Thus, in Chicago, St. P., M. & O. R. Co. v. United States, 8 Cir., 162 F. 835, certiorari denied 212 U.S. 579, 29 S.Ct. 689, 53 L.Ed. 659, where this Court was concerned with a charge that defendant had granted rebates in violation of the statute known as the "Elkins Act," 49 U.S. C.A. § 41 et seq. this pronouncement appears at page 842 of 162F: "In most cases the evil mind or bad intent accompanies the doing of a wrongful act, and no difficulty arises in the disposition

of a case involving an offense malum in se.[2] It is only when an offense malum prohibitum [3] is charged that the application of the general doctrine becomes doubtful."

St. Louis & S. F. R. Co. v. United States, 8 Cir., 169 F. 69, 70, concerned an action to recover a penalty for failure of defendant to comply with a statute providing for the manner of handling livestock in transit, known as the "28-hour law." The opinion deals specifically with the meaning of the words "knowingly and willfully" as used in the statute. Speaking through Judge Van Devanter, later Mr. Justice Van Devanter, this definition was laid down, at page 71 of 169F: " 'Knowingly' evidently means with a knowledge of the facts which taken together constitute the failure to comply with the statute, * * *. 'Willfully' means something not expressed by 'knowingly,' else both would not be used conjunctively * * * But it does not mean with intent to injure the cattle or to inflict loss upon their owner because such intent on the part of a carrier is hardly within the pale of actual experience or reasonable supposition. * * * So, giving effect to these considerations, we are persuaded that it means purposely or obstinately and is designed to describe the attitude of a carrier, who, having a free will or choice, *either intentionally disregards the statute or is plainly indifferent to its requirements.*" (Emphasis added.) The foregoing interpretation and definition by this Court was adopted by the Ninth Circuit in Oregon-Washington R. & Nav. Co. v. United States, 205 F. 337, 339, also involving a penalty for confining a consignment of hogs for more than thirty-six hours without unloading in a humane manner; and in United States v. Illinois Central Railroad Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773, the Supreme Court approved of this court's definition of the

---

2. "Literally 'a wrong in itself.' An act involving illegality from the very nature of the transaction, on principles of natural, moral, and public law." 54 C.J.S. page 909. See also Black's Law Dictionary, 4th Ed.

3. "An act which is wrong only because made so by statute." 54 C.J.S. p. 909; Black's Law Dictionary, 4th Ed.

term "willfully" in this language, 303 U. S. at page 243, 58 S.Ct. at page 535: "That statement has been found a useful guide to the meaning of the word 'willfully' and to its right application in suits for penalties under section 3 [45 U.S.C.A. § 73] (the 28-hour law)." (Citing cases.) Also of interest is the following observation by the Supreme Court in the same case, 303 U.S. at pages 242 and 243, 58 S.Ct. at page 535: "Mere omission with knowledge of the facts is not enough. The penalty may not be recovered unless the carrier is also shown 'willfully' to have failed. In statutes denouncing offenses involving turpitude, 'willfully' is generally used to mean with evil purpose, criminal intent or the like. But in those denouncing acts not in themselves wrong, the word is often used without any such implication. Our opinion in United States v. Murdock, 290 U. S. 389, 394 [54 S.Ct. 223, 78 L.Ed. 381], shows that it often denotes that which is 'intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize 'conduct marked by careless disregard whether or not one has the right so to act.'" In Boone v. United States, 6 Cir., 109 F.2d 560, 563, a criminal prosecution based upon an indictment charging that defendant did "knowingly and willfully solicit, accept and receive" a rebate from a railroad company, the court disposed of a contention comparable to that here advanced, ruling the question in these words, 109 F.2d at page 563: "The penalty is not imposed for unwitting failure to comply with the statute, but for intentionally, carelessly, knowingly or voluntarily disregarding the provisions of the Act and its violation requires neither evil purpose nor criminal intent." Citing United States v. Illinois Central Railroad Co., supra. See also and cf. American Surety Co. of New York v. Sullivan, 2 Cir., 7 F.2d 605, an opinion by Judge Hand.

More to the point on the facts here is United States v. E. Brooke Matlack, Inc., D.C.Md., 149 F.Supp. 814, 816, where the defendant carrier was charged criminally in a 66-count information under the same § 322 we have before us, for failing to require its drivers to file daily logs showing activities during the day as required by § 195.8 of the ICC regulation. As here, the defendant insisted that its failure to require the filing of proper logs was not due to "willful and knowing conduct" on its part. In a well-reasoned and sound opinion the court ruled adversely to defendant, and among other things had this to say at page 819 of 149 F. Supp.:

"The meaning and effect of the word 'wilful' depends upon the context in which it is used in a criminal or penal statute. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Spies v. United States, 317 U.S. 492, at page 497, 63 S.Ct. 364, 87 L.Ed. 418; United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773. * * *

"In the context of the criminal statute involved in this case the word does not connote the existence of an evil motive as it does in some situations involving moral turpitude, as, for instance, in an attempt to wilfully evade the payment of income taxes and thus to cheat the government. See Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, supra. The statute in the present case does not create a crime of moral turpitude, such as were the well known felonies at common law, but enacts a new statutory requirement to be observed by interstate motor carriers in the interest of public safety."

From a consideration of the cases cited above, and the analogous statutes there involved, it is clear that defendant's actions here constituted violations of an offense malum prohibitum, and that the necessary elements constituting "knowingly and willfully" must be determined accordingly. Application of the foregoing principles compels the conclusion that the point relied upon for reversal is without substance. From the

record it is disclosed that the violations occurred between September 28, 1956, and January 31, 1957, a span of approximately four months. One of the drivers transgressed the regulation five times, the driving time varying from a minimum of 12½ hours to a maximum of 14 hours; another driver committed three violations based upon a minimum of 12½ hours to a maximum of 15½ hours driving time; other drivers violated the regulation with excess driving time ranging from 12 to 15½ hours. The logs showing these activities were promptly filed in the office of the St. Louis terminal at the conclusion of each round trip. Whether Mrs. Rulon, the log clerk in that office, was explicitly instructed by her superiors to check the logs for violations does not appear, but that such was her duty may be inferred from all the evidence. In any event, the indisputable fact remains that Mrs. Rulon either failed to discover the excess driving hours, or doing so, completely ignored them and refrained from reporting her findings to her immediate superiors orally, or upon the written forms which she was required to and did transmit daily to the defendant's headquarters in Kansas City, Missouri. And it will not do for the defendant to attempt to cast the entire blame on the log clerk in the St. Louis terminal, for it stands conceded that the logs were forwarded to the Kansas City office and were available there for inspection, ten or fifteen days following the month in which the logs were turned in. Although the excess and prohibited driving hours were readily discoverable to one expert in the field upon a mere "glance" at the logs, no one in defendant's entire organization admitted that he acquired actual knowledge of the violations, until months after the final violation here involved was committed. But the means were present by which the defendant could and would have detected the infractions and its failure to do so under the existing circumstances cannot, as contended, absolve it of liability as a matter of law. As the Supreme Court aptly stated in United States v. Illinois Central Railroad Co., supra, 303 U.S. at page 244, 58 S.Ct. at page 535: "As respondent could act only through employees, it is responsible for their failure." The court in United States v. E. Brooke Matlack, Inc., D.C.Md., 149 F.Supp. 814, at pages 819–820, correctly states our view of the law relating to the responsibility of a corporation, as follows:

"A corporation can act only through its agents. Knowledge of notice to an agent of a corporation acting within the scope of his authority is notice to the corporation. Where an affirmative duty to do something is imposed upon a corporation, it must be performed by some or several of its agents. Conscious disregard of or indifference to the performance of this duty is, in my opinion, what amounts to wilful failure on the part of the corporation * * * While the primary responsibility for conducting the operations of the corporation lay with its principal officers, it was their duty in delegating authority to lesser agents to take effective measures to supervise and assure performance of the affirmative duty imposed upon the corporation. Thus the corporation cannot avoid responsibility by merely saying that a subordinate agent neglected his duty."

The Supreme Court has recently reiterated this proposition in holding that a partnership entity is liable for money penalties for "knowingly" violating ICC regulations for the safe transportation of explosives. United States v. A & P Trucking Company, 79 S.Ct. 203, 207. In stating that impersonal entities can be guilty of "knowing" or "willful" violations of regulatory statutes through the doctrine of *respondeat superior*, the Court observed that "[t]he business entity cannot be left free to break the law merely because its owners * * * partners in the present one * * * do not personally participate in the infraction. The treasury of the business may not

with impunity obtain the fruits of violations which are committed knowingly by agents of the entity in the scope of their employment. Thus pressure is brought on those who own the entity to see to it that their agents abide by the law."

The omissions by defendant in the performance of its duty cannot be excused on the ground that it was accidental or resulted from mere inadvertence. The omissions and failures did not occur in a few isolated situations, but in so many cases in a comparatively short period of time, that it demonstrates a conscious disregard of, or indifference to, the performance of the duty enjoined upon defendant. From the consistent course and pattern of conduct established by the evidence, we hold the trial court was fully justified in finding the existence of the essential elements of the offense.

Affirmed.