**UNITED STATES of America,
Plaintiff,**

v.

**T.I.M.E.–D.C., INC., Defendant.
Crim. A. No. 73–CR–50–R.**

United States District Court,
W. D. Virginia,
Roanoke Division.
Aug. 22, 1974.

732

E. Montgomery Tucker, Asst. U. S. Atty., Roanoke, Va., Jerry N. Williams, Dept. of Transp., Washington, D. C., for plaintiff.

Avrum M. Goldberg, Morgan, Lewis & Bockius, Washington, D. C., and Wilbur L. Hazlegrove, Hazlegrove, Dickinson, Smith & Rea, Roanoke, Va., for defendant.

OPINION and JUDGMENT

DALTON, District Judge.

This proceeding involves a two count criminal information filed against the defendant, T.I.M.E.-D.C., Inc., alleging violation of the Interstate Commerce Act, Part II; Motor Carriers, 49 U.S.C. § 322(a). The defendant is charged with failing to adhere to § 392.3 of the Federal Highway Administration Regulations which provides:

> No driver shall operate a motor vehicle, and a motor carrier shall not require or permit a driver to operate a motor vehicle, while the driver's ability or alertness is so impaired, or so

likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue to operate the motor vehicle. However, in a case of grave emergency where the hazard to occupants of the vehicle or other users of the highway would be increased by compliance with this section, the driver may continue to operate the motor vehicle to the nearest place at which that hazard is removed. 49 C.F.R. § 392.3.

Section 322(a) of the Interstate Commerce Act imposes criminal penalties for the knowing and willful violation of any of the regulations imposed by the Highway Administration.[1] Defendant has entered pleas of not guilty to both counts of the information; and the parties have agreed to resolve this controversy by depositions and briefs rather than trial since the court believes it can be more efficiently and effectively disposed of in this manner.

T.I.M.E.-D.C. is an interstate motor carrier with its main office in Lubbock, Texas. The Company has fifty-six terminals across the nation, and domiciles road drivers at thirty-seven of those terminals. The two incidents which form the basis of the two count information concern T.I.M.E.-D.C.'s second largest relay station at Winchester, Virginia, where in excess of one hundred and seventy line drivers are domiciled. Prior to the incidents the defendant has been experiencing an increase in absenteeism at its Winchester terminal which had caused severe economic problems.[2] In an attempt to combat this

increased absenteeism, the Company instituted a new policy regarding driver mark-offs for illness on August 31st or September 1st. The Company alleges that pursuant to this program a driver calling in to inform the Company's dispatcher that he would be absent due to illness was told that his absence would be considered unexcused unless he submitted a doctor's slip or similar verification of his illness. Absent medical verification, an unexcused absence letter, stating that the absence on a particular day for sickness was unexcused, would issue. If the driver submitted verification of his illness, the unexcused absence letter would be expunged from his record, and a second letter excusing the absence sent to the driver. Although the Company alleges that its dispatchers were instructed to convey this information to all drivers calling in to mark off, the exact content of the conversations between the dispatcher and the drivers involved in the incidents in question is in controversy, and will be subsequently considered. In addition, the Company's terminal manager testified that the Company did not begin issuing letters of retraction informing drivers that their absence was considered excused until December, 1972 or January, 1973, after the incidents involved.[3]

The first of the two incidents occurred on Saturday, September 8, 1972, approximately one week after the program had been initiated, when line driver Loring R. Nail's wife telephoned the Company's dispatcher George Giles and asked that her husband be marked off work that evening because he had in-

---

1. 49 U.S.C. § 322(a) provides:

   (a) Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not less than $100 nor more than $500 for the first offense and not less than $200 nor more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense.

2. The Winchester, Virginia terminal receives transport orders at approximately 6 p.m. for runs to begin as early as 7 p.m. If drivers telephone the Company's dispatcher and mark off during the afternoon there may not be enough drivers for the runs resulting in significant delays in delivery.

3. The Government objected to the introduction of any evidence pertaining to the issuance of retraction letters since the Company did not begin issuing them until after the incidents in question. The Court, however, deems this evidence admissible.

jured his back. Dispatcher Giles responded that he would mark Mr. Nail off his run and that pursuant to the Company's unexcused absence procedure the markoff would be considered unexcused and an unexcused absence letter would issue. The remainder of the conversation is on dispute, with Giles testifying that he informed Mrs. Nail that the letter would be voided if Mr. Nail provided a doctor's slip; and driver Nail and his wife indicating that Giles did not relate this information.[4]

Within an hour of Mrs. Nail's conversation, Mr. Nail telephoned dispatcher Giles. He inquired regarding the effect of the unexcused absence letter and was informed that his absence would be considered unexcused and that he would receive a letter to that effect which would be placed in his file. Part of this conversation is also disputed, with Giles stating that he explained that a doctor's certificate would nullify the letter and driver Nail testifying that he did not believe he was given this information by dispatcher Giles.[5] Driver Nail then

4. Giles testified to the following:
Q. All right, sir.
Did Mrs. Nail call to ask you to mark her husband off because of an injured back?
A. Yes, sir.
Q. Did you explain that this was an unexcused absence?
A. I had been instructed by my company officials to inform anyone calling in to mark off sick that it would be an unexcused markoff unless a doctor's slip was presented at which time an unexcused markoff would be voided.
Q. In other words, the doctor's certificate then, the letter would issue?
A. Would be issued.
Q. Unless, the letter would be issued forthwith, unless a doctor's certificate came in first, is that correct?
A. Right.
Q. Did you tell them this?
A. Yes, sir.
Mrs. Nail testified as follows:
Q. Why did he ask you to call the terminal?
A. To mark him off because he hurt his back.
Q. What did you say to the terminal?
A. I called them and told them he had hurt his back and he would like to mark off.
Q. Yes, ma'am. What did they say?
A. They said that if he marked off he would get a letter so I didn't know what the letter was about so I went and called him.
Mr. Nail testified as follows:
Q. Did Mrs. Nail call the company?
A. Yes, sir.
Q. What did you ask her to tell the company?
A. Mark me off, that I fell and hurt my tailbone.
Q. Did they do that?
A. Yes, sir.
Q. What did the company say?
A. Well, I can mark off but under protest; I would get a letter.

5. Dispatcher Giles testified as follows:
Q. Now, you have testified on direct that you are familiar with Mr. Nail and Mr. Nail's incident on September 8. In your telephone conversation with Mr. Nail, when he called you back, did you have occasion to explain to him the unexcused markoff and the necessity to get a doctor's slip to have that removed?
A. Yes, sir.
Q. Did he raise the question specifically with you?
A. He wasn't too happy because, the reason he called me back, he wasn't happy. I explained to him the procedure on the markoff.
Q. What did you tell him?
A. That, well, I said I had been directed by my company officials to explain this letter; that it would be an unexcused markoff unless he presented a doctor's slip.
Mr. Nail testified as follows:
Q. Did Mr. Giles tell you that if you were going to a doctor and brought in a slip that the letter would be not sent or removed from your file?
A. I don't think that was brought up, no, sir.
Q. Are you sure about that?
A. On my part, I don't remember going into that detail.
Q. You called him back?
A. Yes.
Q. And I take it to find out what about this letter?
A. Yes, sir.
Q. Now, if you could think back, give me your best recollection as to whether or not it was explained to you at that time that if you brought in a doctor's slip, that you would not get the letter if the letter had been issued, it would be withdrawn? Do you have any recollection of Mr. Giles saying that?
A. Well, it's possible, I will put it that way.
Q. It is possible?
A. Yes, sir.

stated that he had too many years of service with the Company to receive another letter and requested to be placed back in the lineup. At approximately 7:00 p.m. that evening, driver Nail arrived at the terminal, picked up his route bills, and departed on his normal run to Baltimore and back.

The second incident occurred on Saturday, October 21, 1972, when driver Carlton Brown's wife telephoned dispatcher Giles and asked him to mark her husband off work for that evening because he had an ear infection and was going to a doctor. In response, Giles told Mrs. Brown that an unexcused letter would issue and a copy would be placed in her husband's file. Mrs. Brown and dispatcher Giles provide differing testimony as to the remainder of the conversation. Dispatcher Giles indicated that he did inform Mrs. Brown of the doctor's certification and Mrs. Brown testified that it was not explained to her.[6]

Approximately three hours after this conversation, just prior to 6:00 p.m., driver Brown telephoned the Company and requested to be placed back in the lineup.[7] Between 10:00 and 10:30 p.m.,

6. Giles testified as follows:
Q. Do you recall that Mrs. Brown called to ask Mr. Brown to be marked off, to have him marked off because of his inner ear infection?
A. Yes, sir; Mrs. Brown called me, said her husband had an ear infection.
Q. Did you also explain to her that this was an unexcused absence and he would get a letter unless he brought in a slip from a doctor later that afternoon?
A. This is the procedure we go through, yes. . . .
Q. Now, with regard to the Brown incident of October 21, 1972, do you recall if you made the same statement to Mrs. Brown regarding these letters of information and the requirement for a doctor's slip?
A. When she called and told me that Carlton had an ear infection, s'e told me he was going to a doctor.
Q. She told you he was going to a doctor?
A. That he was going to a doctor. Then it was explained to her about the letters of warning. It would be unexcused markoff unless he did bring in the doctor's slip.
Q. So did you tell her to tell him to get a doctor's slip?
A. No, sir.
Q. Did she ask you about the slip aspect of it?
A. No, sir.
Q. Did she ask you anything about it other than just the letters?
A. No, sir.
Mrs. Brown testified as follows:
Q. Do you recall a phone call you made to Mr. Brown's employer on or about October 21, 1972?
A. Yes, sir, I do.
Q. Was that in connection with his ear infection?
A. Yes, sir.
Q. Would you relate to us, please, ma'am, what you were doing when you made the call? For what purpose did you call?
A. I was calling to mark him off sick due to his ear infection.
Q. When you called the employer and advised that Mr. Brown wanted to mark off because of his ear infection, what was the response you got?
A. Well, he said, all right, but I guess he knows about the letter he will get.
Q. Did he mention anything about requiring a doctor's certificate?
A. No, sir.
Q. Did he mention any other way that the letter could be avoided other than Mr. Brown's going ahead and driving?
A. No, sir; there was nothing said. That was all.
Mr. Brown testified as follows:
Q. What was the response of the company to the call?
A. They told her that I guess that I knew about the letter I would get or something to that effect.
Q. What sort of letter was this?
A. Unexcused absence.

7. Mr. Brown related the following information regarding this conversation.
Q. Would that be when your wife called?
A. Right, that was when she called. And we have a 6:00 o'clock deadline; we mark off before 6:00, so that the dispatchers can make the lineup up. I called them back just before 6:00 so I wouldn't mess the lineup up and told them to put me back in the lineup.
Q. Was there any mention of any requirement that you go to the doctor when the company mentioned the letter to your wife?
A. They didn't mention it to me, no. . . .
Q. Now, when you called back to the terminal on the 21st and marked back on the board, is that all in effect you told the dispatcher, put me back on the board?
A. Put me back on lineup, I would work.
Q. Did you ask him any questions?
A. No, sir.

driver Brown appeared at the terminal, picked up his route bills and departed for Knoxville, Tennessee. After traveling 110 miles, he stopped to inspect his vehicle. He became nauseous and vomited. He realized he could not continue and, therefore, contacted the Company and was advised to obtain medical treatment. Relief was sent, and Brown went to a hospital emergency room where he was treated for an inner-ear infection and then returned to his home by the Company. Subsequently, Brown provided the Company with a doctor's certificate confirming his ailment.

The Government's argument extrapolates as follows. T.I.M.E.-D.C. was experiencing significant absenteeism at its Winchester terminal. This absenteeism disrupted scheduling and produced delivery delays, which precipitated economic losses. In addition, a recent grievance committee determination on a petition filed by the driver's union in 1971 had abrogated the Company's prior unexcused absence policy. The committee ruled that the Company could not require a driver, who had marked off due to illness, to submit a doctor's certification prior to being permitted to return to work so long as he was off duty five days or less and his ailment was minor. Faced with the necessity of considering a new policy, the Company attempted to implement its new program so as to also discourage the absenteeism it was experiencing. In the alternative, the Company sought to document all unexcused absences to prevent contributions beyond its obligation to the driver's medical insurance plan.[8] In order to accomplish its objective of decreasing absenteeism, the company refrained from fully explaining various aspects of its new policy, thereby creating an aura of confusion and concern which would coerce drivers into refraining from marking off due to illness. However, by so doing, the Government contends that the Company disregarded the requirements of the Federal Highway Administration Regulation intended to prevent ill or fa-

---

Q. Did you say to him that you felt, I will or have any discussion?
A. No, sir.
Q. Just put you back on the board?
A. Put me back on the board. I would try to work. . . .
Q. And that the thrust of it was to inform them that they should put you back in the lineup or that you were going to attempt to make the trip anyway.
Let me ask you, sir, if this—I'm going to read from this statement and ask you if this refreshes your recollection to the point that you can tell us whether or not it is a correct statement?
"On October 21, 1972 I had an ear infection. The ear was sore and stopped up and I couldn't hear anything out of it. About 3:00 p.m. I had my wife call the terminal to have me marked off because of my ear. George Giles, the dispatcher, told my wife, I would get an unexcused absence letter. I thought about it and decided I would try to work because I didn't want to get the letter. I called the terminal at 5:55 p.m. and talked to Joe Zimmerman, the dispatcher. I asked him why I would get a letter and he said that anyone who didn't work would get a letter. I told him to put me back in the lineup. He told me I was to leave at 10:00 for Knoxville."

Is that substantially accurate, sir?
A. Yes, sir.

8. The Company asserts that one of the immediate precipitating factors for instituting the new policy stems from a claim for health benefits filed by road driver Maurice Willingham. Willingham had marked off due to illness from the last week in January, 1972, until April, 1972. Although the Company was obligated to continue contributions for four weeks for employees who were absent because of illness and notified the Company; T.I.M.E.–D.C. considered Willingham's illness not covered because he had not provided documentation of his illness.
The union filed a grievance because of the Company's failure to make contributions to the health plan on Willingham's behalf, thereby denying him health benefits. The Company eventually paid, after being advised that it should have notified Willingham that his absence was considered unexcused and that contributions would not be continued during his absence. This notice would absolve the Company of its duty to continue contributions on behalf of an employee during the period that he was off work and place the burden on the employee of providing proper verification of his illness to the Company.

tigued drivers from operating motor vehicles.

The evidence reveals that the Company did not notify the drivers of the new policy by placing notices on the terminal bulletin boards or conducting group meetings, although the Company did publish notices for some work rules and did conduct informational group safety meetings to discuss safe driving practices. The Winchester terminal manager testified that the Company did not publish any explanation of the new program. Instead, the company relied on "word-of-mouth" to convey the elements of its unexcused absence policy. Of course, the content of the conversations wherein the policy was explained to the drivers is a major point of controversy.[9] The Company contends its dispatcher explained that if a doctor's verification was presented the unexcused absence would be voided. The testimony of drivers Nail and Brown indicates that there is a question as to whether they were informed of the procedure for voiding an unexcused absence letter. The confusion regarding the policy is further documented by dispatcher Giles' testimony that several drivers had questioned him as to its import. In addition, the government argues, even assuming the possibility of voiding the letter was mentioned, the Company's explanation left many unanswered questions.[10]

■ The Government asserts that the unexcused absence policy was particularly coercive because of the drivers' uncertainty regarding the effect of an unexcused absence letter in comparison with the warning notice permitted under the union's collective bargaining agreement. In October of 1972, the driver's union filed a grievance against the Company concerning this question.[11] The union charged that the unexcused absence letter policy violated 1) the warning notice provisions of Article 45[12]; and 2) the

---

9. See notes 4–7 and accompanying text *supra*.

10. In its brief the Government cites the following limitations to the notice:

■ (Force and Effect) The policy left the measure of discipline to *ad hoc* determination. No definite standard existed regarding:

How many letters in what period time put the driver in "trouble"?

What measure of discipline or jeopardy to a driver's job well-being was called for?

■ (Procedural Information) The policy did not specify the following:

The latest time that, by bringing in a doctor's certificate, the unexcused absence letter could be prevented.

The latest time that withdrawal of the letter would be meaningful.

Whether a copy of the letter went into a driver's personnel file or some other file.

■ (Procedural Information) The policy did not require Defendant to formally notify a driver if an unexcused absence letter was withdrawn.

11. The Company was required to issue a warning notice to a driver prior to discharging or suspending him for a violation of Company regulations or procedures. This notification indicated to the driver the circumstances of his violation and informed him that a reoccurrence within nine months would subject him to more severe disciplinary action. The warning notices were sent by certified mail, return- receipt requested, and indicated that the recipient should consider it a warning letter. The unexcused absence letters were sent by regular mail and did not indicate that a warning notice was intended.

The Government objected to the introduction of testimony pertaining to the fact that it was the Company's practice to send warning notices by certified mail and to include a passage in the notice indicating that it was a warning notice. The Government also objected to the introduction into evidence of copies of a warning notice, an unexcused absence letter, and a retraction letter excusing an absence. The court deems the above evidence admissible.

12. Article 45 provides in part:

The Employer shall not discharge nor suspend any employee without just cause, but in respect to discharge or suspension shall give at least one warning notice of the complaint against such employee to the employee, in writing, and a copy of the same to the Union affected, except that no warning notice need be given to an employee before he is discharged if the cause of such discharge is dishonesty, or drinking of, or under the influence of, alcoholic beverages or drugs during working hours including meal period, or subject to call at away-from-home

safety related provisions of Article 16.[13] The ultimate determination, which was rendered subsequent to the incidents involved, denied the union petition and determined that the unexcused absence letter was not tantamount to a warning letter and did not violate the safety related provisions.

In conclusion, the Government contends, that the above recounted evidence establishes that the Company has violated § 322(a). The communications to the Company's dispatching agent constituted knowledge that the driver's ability or alertness was so impaired as to make it unsafe for them to operate a motor vehicle. Their subsequent indications that they desired to be placed back on duty did not nullify the Company's awareness in light of the Company's knowledge that it had not fully explained its new policy and the resulting confusion and concern this had generated.

■ In order to establish that the defendant has violated 49 U.S.C. § 322(a) the Government must prove that the Company knowingly and willfully permitted drivers Nail and Brown to operate their vehicles, while their ability or alertness was so impaired, or so likely to become impaired, through illness, as to make it unsafe for them to begin to operate their motor vehicles. 49 C.F.R. § 392.3. The court concludes, as a matter of fact, that the drivers' ability and alertness was impaired, or likely to become impaired, through illness within the meaning of the Regulation.[14] Consequently, the only question remaining for resolution is whether the Government has established beyond a reasonable doubt that the Company acted knowingly and willfully.

■ The Company does not contend that it was unaware of the regulation, therefore, the sole issue regarding knowledge is whether the Company knew that the drivers were ill. Before addressing this issue, however, it is necessary to discuss the agency principles applicable to determining the knowledge attributable to the Company. A corporation can only act through its employees and, consequently, the acts of its employees, within the scope of their employment, constitute the acts of the corporation. Likewise, knowledge acquired by employees within the scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly. Steere Tank Lines, Inc. v. United States, 330

terminal, or recklessness resulting in serious accident while on duty, the carrying of unauthorized passengers or failure to report a serious accident or one which employee would normally be aware of. Discharge or suspension must be by proper written notice to the employee and the Union affected.

13. Article 16 provides in part:
    Under no circumstances will an employee be required or assigned to engage in any activity involving dangerous conditions of work or danger to persons or property or in violation of any applicable statute or court order, or in violation of a government regulation relating to safety of person or equipment. The term "dangerous conditions of work" does not relate to the type of cargo which is hauled or handled.

14. There was sufficient, and essentially uncontradicted testimony, which the court chooses not to recount, which establishes that both drivers were impaired within the meaning of the statute. The only evidence to the contrary is the drivers' testimony that they believed they could make their respective trips without incident. This testimony appears to be a product of their concern over admitting that they had violated the regulation by driving while impaired, and when considered in comparison with their testimony regarding the extent of their respective illnesses is of little evidential value.

F.2d 719 (5th Cir. 1963); Riss & Co. v. United States, 262 F.2d 245 (8th Cir. 1958); Inland Freight Lines v. United States, 191 F.2d 313 (10th Cir. 1951); United States v. Sawyer Transport, Inc., 337 F.Supp. 29 (D.Minn.1971).

Applying these principles, the Company, through its employees, was aware of the following circumstances. On two separate occasions, a wife of one of its drivers had telephoned the dispatcher, described an illness from which her husband was suffering, and requested that he be marked off work. Subsequently, the driver called back and, after expressing uncertainty and concern over the effect of the unexcused absence letter which would issue, requested to be reinstated for duty. These incidents occurred at a time when the Company had made no effort to explain its new policy other than "word-of-mouth" communications to individual drivers who requested to be marked off. In addition, the Company was aware that several drivers had inquired regarding the new policy and that prior to the second incident, concern over the effect of an unexcused absence letter in relation to a warning notice had resulted in the filing of a union grievance petition.[15]

█ It is the court's opinion that the Company had sufficient information available to it, through its various employees, to know that driver Brown's ability to drive was impaired, or likely to become impaired, as to make it unsafe for him to begin his trip. The court reaches the opposite conclusion regarding driver Nail, and bases this distinction on the information available to the Company as a result of the union grievance petition pertaining to the unexcused absence letters. Although there is evidence that drivers expressed doubt and concern about the letters prior to the filing of the petition, the court is re-

luctant to rule that the Company had knowledge of the potential for coercion inherent in its method of implementing its new policy, without additional notice of driver uncertainty. Such additional information was available, however, as a result of the grievance petition which evidenced that there was significant concern among the drivers regarding the import of the unexcused absence letter policy.

█ This view is supported by those cases which have analyzed § 322(a) in connection with regulations other than § 392.3. *E. g.*, Steere Tank Lines, Inc. v. United States, 330 F.2d 719 (5th Cir. 1963); Riss & Co. v. United States, 262 F.2d 245 (8th Cir. 1958); United States v. Sawyer Transport, Inc., 337 F.Supp. 29 (D.Minn.1971) (involving § 322(g) which also proscribes knowing and willful violation). These cases stand for the proposition that a corporate defendant is deemed to have had knowledge of a regulatory violation if the means were present by which the company could have detected the infractions.

█ The Company attempts to distinguish these and other cases because of the written and other factual recordings available to the companies which were considered significant in establishing guilt.[16] While the court agrees that these cases are distinguishable in this regard, the Company's interpretation and argument indicates that it misconceives its responsibility under the regulation and related statute. The Company's argument would lead to the conclusion that absent documented evidence of illness—whether by medical verification, observation by one of its agents, or an unqualified assertion by a driver—presented to the appropriate employee, it cannot be deemed to have had knowledge of a driver's impairment. The court would agree, if the Company had not implemented its new program in a manner

---

15. The grievance was filed prior to the Brown incident, but subsequent to the Nail incident.

16. Riss & Co., Sawyer Transport, Inc., and Steere Tank Lines, Inc., all involved infractions which were discoverable by examination of driver logs and records.

which was likely to have a significant effect upon a driver's decision to mark off due to illness. Cognizant of this situation, however, the Company could not simply rely on driver Brown's subsequent request to be placed back on duty as absolving it from its responsibility to ensure that the requirements of § 392.3 were not ignored. For just as the companies prosecuted pursuant to sections 195.4, 195.8 and 395.8 had the "means to know" of the violations by examining their records, T.I.M.E.-D.C. had the means to detect these violations by adopting a realistic approach to the program it had recently implemented, and recognizing its likely effect upon a driver's adherence to the safety regulation. Nor does this court attach the critical importance which the Company does to the drivers' appearance before the terminal dispatcher in order to obtain their route bills prior to departure. There is no evidence that this was intended as a safety check, and any observation by the dispatcher would have only disclosed the most obvious ailments, and not the sort of infirmity which disabled driver Brown.

In addition to establishing that the Company acted knowingly, the Government must also prove that the alleged violation was committed willfully in order to sustain a conviction. The statute under consideration is of the malum prohibitum class, rather than malum in se, and therefore the Government need not prove an evil purpose or specific criminal intent in order to establish willfulness. Judicial interpretation of regulatory statutes of this nature indicate lesser proof is sufficient to establish this element of the offense. Steere Tank Lines, Inc. v. United States, 330 F.2d 719 (5th Cir. 1963); Riss & Co. v. United States, 262 F.2d 245 (8th Cir. 1958); United States v. Sawyer Transport, Inc., 337 F.Supp. 29 (D.Minn. 1971); United States v. E. Brooke Matlack, Inc., 149 F.Supp. 814 (D.Md.1957). As articulated by the Supreme Court, the following import is intended:

Mere omission with knowledge of the facts is not enough. The penalty may not be recovered unless the carrier is also shown "willfully" to have failed. In statutes denouncing offenses involving turpitude, "willfully" is generally used to mean with evil purpose, criminal intent or the like. But in those denouncing acts not in themselves wrong, the word is often used without any such implication. Our opinion in United States v. Murdock, 290 U.S. 389, 394 [54 S.Ct. 223, 78 L. Ed. 381, 384], shows that it often denotes that which is "intentional, or knowing, or voluntary, as distinguished from accidental," and that it is employed to characterize "conduct marked by careless disregard whether or not one has the right so to act." The significance of the word "willfully" as used in section 3, now before us, was carefully considered by the Circuit Court of Appeals for the Eighth Circuit in St. Louis & S.F.R. Co. v. United States (C.C.A. 8th) 169 F. 69. Speaking through Circuit Judge Van Devanter, now Mr. Justice Van Devanter, the court said (page 71): " 'Willfully' means something not expressed by "knowingly," else both would not be used conjunctively. * * * But it does not mean with intent to injure the cattle or to inflict loss upon their owner because such intent on the part of a carrier is hardly within the pale of actual experience or reasonable supposition. * * * So, giving effect to these considerations, we are persuaded that it means purposely or obstinately and is designed to describe the attitude of a carrier, who, having a free will, or choice, either intentionally disregards the statute or is plainly indifferent to its requirements."

United States v. Illinois Central R.R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1937).

The Company contends that the Government has failed to establish facts which indicate that it consciously

disregarded the regulation or was plainly indifferent to its requirement. It again argues that those prosecutions which resulted in convictions pursuant to § 322(a) are factually distinguishable from the instant controversy. In contrast with those cases, T.I.M.E.-D.C. had not received prior notice from a governmental regulatory agency of apparent violations, nor had there been former prosecutions for similar violations. Furthermore, there is no evidence of numerous violations over a short period of time.[17]

Certainly evidence of the above would be extremely probative of willful disregard of the regulation. Nevertheless, absence of this evidence does not foreclose conviction under the statute. The Company had an affirmative responsibility not to "require or permit" drivers to operate their vehicles while impaired. Cognizant of the situation—for, as previously noted, the Company is held responsible for the knowledge acquired by its various employees—it adopted a more or less "hands-off" attitude towards compliance with the regulation and, in effect, left adherence almost entirely the responsibility of its drivers. Consequently, the court determines that the Government has established beyond a reasonable doubt that the Company did "willfully" disregard its duty under § 392.3.

For the aforementioned reasons, the court finds the defendant not guilty of violating 49 U.S.C. § 322(a) on September 8, 1972 (count 1 of the information) and guilty of violating this section on October 21, 1972 (count 2) and imposes a penalty of One Hundred ($100) Dollars; and each side shall bear their own costs.

17. The Company also asserts its safety record as a relevant consideration on whether it violated the statute, citing Riss & Co., E. Brooke Matlack, Inc., and United States v. Joralemon Brothers, Inc., 174 F.Supp. 262 (E.D.N.Y.1959). While the court does believe this is a factor to be considered, it is not to be accorded significant weig'.t, especially when the Company has instituted a new policy in a manner which is inconsistent with its prior record. The court also notes

that in Riss & Co. a guilty verdict was affirmed, and in E. Brooke Matlack, Inc., the company was found guilty despite their safety record.

The Government objected to the admission of all testimony regarding the Company's safety record and to the entire testimony of the Company's Manager of Safety regarding the Company's safety practices and record. The court rules that this testimony is admissible.