**UNITED STATES of America, Appellee,**

v.

**Paschal DEMAURO, Defendant-Appellant.**

**No. 644, Docket 77–1463.**

United States Court of Appeals, Second Circuit.

Argued Feb. 8, 1978.

Decided July 20, 1978.

---

Milton S. Gould, New York City (Shea Gould Climenko & Casey, Michael Lesch, Richard F. Czaja, New York City, of counsel), for defendant-appellant.

Lawrence B. Pedowitz, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FEINBERG, MANSFIELD, and Van GRAAFEILAND, Circuit Judges.

MANSFIELD, Circuit Judge:

After a nonjury trial in the Southern District of New York before Judge Charles H. Tenney, Paschal Demauro, a former

Chemical Bank ("Chemical") vice president in charge of 23 of its branches located in northern Manhattan and the Bronx, was found guilty of making false material declarations before a federal grand jury with respect to his knowledge regarding the activities of certain Chemical employees in "washing" currency (exchanging large denomination bills for small ones), 18 U.S.C. § 1623. Judge Tenney set forth his findings of fact and conclusions of law in a thorough 25-page opinion that has not been reported. We affirm.

In November, 1976, Demauro was called to testify before a grand jury sitting in the Southern District of New York. The grand jury was investigating possible criminal violations, by Chemical and its employees, of the Bank Secrecy Act, 31 U.S.C. §§ 1051–55, 1058–59, 1081–82, and the regulations promulgated thereunder, 31 C.F.R. §§ 103.-11, 103.21–.22, 103.25–.26, 103.49, and of the conspiracy statute, 18 U.S.C. § 371. The grand jury's investigation centered on allegations that certain narcotics dealers had bribed Chemical employees to furnish them with large denomination bills in exchange for large quantities of small denomination bills. Large denominations bills facilitate trade in the narcotics business.

The grand jury indicted Demauro for perjury on February 24, 1977. It also returned an indictment charging Chemical with a felony violation of the Bank Secrecy Act, which beginning on June 15, 1974, required banks to file reports with the Federal Reserve concerning cash transactions in excess of $10,000. The indictment against Chemical was based in part on evidence that the bank had failed to report hundreds of cash transactions in excess of $10,000, including numerous unreported transactions in which employees, in return for cash payments in the nature of bribes, had exchanged $10,000 to $250,000 in large bills for small. Chemical later pleaded guilty to a superseding information charging it with 445 misdemeanor violations of the Bank Secrecy Act, and was fined $222,500.

The grand jury also returned indictments charging tax violations against Thomas Spinelli and Michael Strolla, two Chemical branch managers who had failed to report on their income tax returns the cash bribes they received in return for money-washing, and against Anthony D'Ambrosio, a narcotics dealer who had exchanged money at Spinelli's branch. Spinelli and Strolla pleaded guilty to the offenses alleged in these indictments.

Demauro testified before the grand jury that he had first learned in September, 1975, that money-exchanging had occurred at Chemical Bank branches and he specifically denied being advised prior to that time by several bank employees that money was being exchanged at Chemical branches. At trial the Government sought to prove that this testimony was knowingly false by introducing the testimony of numerous witnesses (including five former Chemical bank employees) directly contradicting Demauro's grand jury testimony. These former employees, as well as other Government witnesses, described incidents occurring between 1968 and 1974 in which they had had discussions with Demauro concerning money-exchanging at Chemical branches.

After hearing from these witnesses and from Demauro, who testified at trial and claimed that the Government witnesses were lying, Judge Tenney found that "the entire fabric of defendant's testimony at trial revealed a concerted and continuous effort to give false testimony in the face of contradictory testimony from a long string of witnesses". He further found that "the evidence of these witnesses leads to the inescapable conclusion that Demauro was informed of money washing [at Chemical] as early as 1968 and thereafter on a number of occasions." Of the twenty responses alleged in the indictment to have been perjurious, Judge Tenney found thirteen of them to have been knowingly false and material beyond a reasonable doubt and the remaining seven to be literally true, although some were "evasive."

## DISCUSSION

Demauro's principal contention is that his testimony, even if false, was not material to

the grand jury's investigation and therefore did not violate the perjury statute, 18 U.S.C. § 1623, which is limited to prohibition of "false material declarations."

■ The test of materiality under § 1623 is whether the testimony alleged to be perjurious has "a natural effect or tendency to influence, impede, or dissuade the grand jury from pursuing its investigation." *Carroll v. United States*, 16 F.2d 951, 953 (2d Cir.), *cert. denied*, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927). Judge Tenney properly recognized that application of this test required an examination of "both the nature of the inquiry at which the testimony was given and the evidence introduced at trial to prove its falsity, in order to determine whether a truthful answer could conceivably have aided the grand jury investigation."[1] *United States v. Mancuso*, 485 F.2d 275 (2d Cir. 1973) (footnote omitted).

Demauro argues that under the doctrine of *respondeat superior* the acts of the Chemical employees who engaged in money washing would be automatically attributable to it and that therefore his personal knowledge of money washing and possibility of non-compliance with the Bank Secrecy Act was irrelevant to the issue of the bank's

criminal liability and not material to the grand jury's investigation.

■ It is true that as a general rule a corporation is liable for the criminal acts of its employees if done on its behalf and within the scope of the employees' authority. *See, e. g., J.C.B. Super Markets, Inc. v. United States*, 530 F.2d 1119 (2d Cir. 1976); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 204–05 (3d Cir. 1970); *United States v. Ridglea State Bank*, 357 F.2d 495, 498–500 (5th Cir. 1966); *United States v. Carter*, 311 F.2d 934, 942 (6th Cir.), *cert. denied*, 373 U.S. 915, 83 S.Ct. 1301, 10 L.Ed.2d 415 (1963); *Standard Oil Co. v. United States*, 307 F.2d 120, 128–29 (5th Cir. 1962). However, since the Chemical employees involved here had been bribed to wash the currency without reporting the transactions as required by the Bank Secrecy Act, the bank could well have argued that it was not liable for their violations of the Act since the employees had acted in their own and not the bank's interests. *See United States v. Ridglea State Bank, supra; Standard Oil Co. v. United States, supra.* Indeed, Chemical's counsel made this argument when the bank entered a guilty plea to a superseding indictment.[2]

1. Demauro argues that we should apply the "more stringent view of materiality" expressed in *United States v. Freedman*, 445 F.2d 1220 (2d Cir. 1971), rather than the *Carroll-Mancuso* test. The *Freedman* formula states that the Government must show ". . . that a truthful answer *would* have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation *would* have occurred." *Freedman, supra*, 445 F.2d at 1227. (emphasis supplied). The *Freedman* standard was repeated in *United States v. Birrell*, 470 F.2d 113, 115, n. 1 (2d Cir. 1972). *Compare Mancuso, supra*, 485 F.2d at 280–81, where we stated that the issue is ". . . to determine whether a truthful answer *could conceivably* have aided the grand jury investigation." (emphasis supplied)

In *Mancuso, supra*, and *United States v. Doulin*, 538 F.2d 466, n. 3 (2d Cir.), *cert. denied*, 429 U.S. 895, 97 S.Ct. 256, 50 L.Ed.2d 178 (1976), we found it unnecessary to decide the question of whether *Freedman*, which involved a claim of perjury in an SEC proceeding, applied in the context of a grand jury investigation. We reach the same conclusion here, since the questions asked of Demauro sought information

material to the grand jury's investigation under either the *Freedman* or *Carroll-Mancuso* standard.

The standard of materiality must necessarily be rather extensive, since the investigative powers of the grand jury are so broad. *See United States v. Calandra*, 414 U.S. 338, 343–44, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). As the authors of a leading commentary have noted, a broadly defined view of materiality makes for a "potent" perjury sanction, observing that this "makes sense if the grand jury, entitled to range broadly in its inquiries, is to have truthful responses that will assist its inquiry and not intentional falsehoods likely to derail the investigation." Frankel & Naftalis, *The Grand Jury* 105 (1977).

2. On April 14, 1977, Chemical pleaded guilty to 445 misdemeanor violations of the Bank Secrecy Act. Chemical's counsel stated to Judge Carter, who received the plea, that "[w]e believe that under existing law, the fact that Bank employees were bribed by the individuals involved to perform this service shows they were not acting for the Bank or in the Bank's interest when they engaged in these transactions."

Under these circumstances, it was appropriate for the grand jury first to determine the extent to which the bank's responsible supervisory personnel, such as Demauro, were aware of the money-exchanging going on at Chemical branches rather than to assume that corporate criminal liability could be predicated solely on the acts of the bribed employees. The grand jury's investigation would permit the Government to show that, assuming the inapplicability of the doctrine of *respondeat superior* to conduct of bribed corporate employees claimed by Chemical to have been acting on their own,[3] the bank might nevertheless be criminally liable for the conduct of its supervisory employees who had either intentionally disregarded the law or had acted with plain indifference to its requirements. *Steere Tank Lines, Inc. v. United States*, 330 F.2d 719, 722–23 (5th Cir. 1963); *Riss & Co. v. United States*, 262 F.2d 245, 249–51 (8th Cir. 1958). The grand jury's inquiry into Demauro's awareness, as a member of Chemical's supervisory personnel, of money-changing on the part of its employees was, therefore, clearly material to its investigation.

Aside from the materiality of Demauro's testimony to the issue of corporate liability, the grand jury was engaged in a complex investigation involving numerous potential targets, several different statutory offenses, and the prospect of individual as well as corporate liability. Under the Bank Secrecy Act an individual as well as a corporation may be held criminally liable for violation of its provisions. *See* 31 U.S.C. §§ 1058–59, § 1082. Demauro's testimony with respect to some of the individual employees involved in currency-washing transactions was therefore also material to the grand jury's investigation of them, as is evidenced by the resulting indictments of Spinelli and Strolla. Thus it is clear that

truthful testimony by Demauro could have aided the grand jury, *United States v. Mancuso, supra*, 485 F.2d 275 and false testimony could impede its investigation. *Carroll v. United States, supra*, 16 F.2d 951.

Demauro also challenges Judge Tenney's admission of the testimony of one witness, John S. Martin, Jr., Esq., over the defense objection that it disclosed privileged attorney-client communications between Demauro and Martin. Martin, a lawyer practicing in New York City, was retained by Chemical in 1975 to represent it when the bank was notified by the Southern District United States Attorney's Office that it was the subject of a criminal investigation. Chemical also asked Martin to conduct an internal investigation to determine whether, and to what extent, bank employees had been involved in money washing. In the course of this internal investigation, Martin interviewed scores of Chemical employees, including Demauro, who was questioned approximately one year prior to his grand jury appearance. During this interview, which was also attended by Chemical's general counsel, John Wynne, Demauro denied that he had ever been told, prior to the investigation, of money-exchanging going on at Chemical branches.

Martin's testimony, including his description of his interview of Demauro, was relevant because, although Demauro was not otherwise implicated in any wrongdoing, the testimony might show that he had been motivated to deny prior knowledge of money washing at Chemical branches by a desire to avoid being dismissed from his position with the bank. Indeed, upon summation, the Government argued:

> By the time the defendant himself was interviewed by John Martin and John Wynne in early October 1975, he knew that quite a number of the employees he

---

**3.** Under a *respondeat superior* theory of corporate criminal liability, the master's liability would depend on whether the servant's acts were within the "scope of the employment." *See* Prosser, *Torts* 352 (1955). As Professor Prosser has described it, to be within the scope of the employment, the "servant's conduct" must be "the kind which he is authorized to perform, occurs substantially within the authorized limits of time and space, and is actuated at least in part, by a desire to serve the master." *Id.* Thus Demauro underestimates Chemical's argument that it could not have been held criminally liable solely on the basis of acts of bribed employees pursuing their own interests.

had supervised between 1968 and the end of 1974 had been interviewed about exchanging; that some had admitted their involvement; and that, as a former Vice-President in charge of the Bronx branches, his job was in jeopardy if he admitted any knowledge of money-exchanging in the Bronx and upper-Manhattan, since he had not taken effective steps to see that the participants were disciplined. (footnote omitted).

■ In an effort to preclude introduction of this relevant proof Demauro assumed the burden of establishing that the communications were made in the course of an attorney-client relationship between Martin and himself. *United States v. Stern*, 511 F.2d 1364, 1367 (2d Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975); *In re Bonanno*, 344 F.2d 830, 833 (2d Cir. 1965). At the very least Demauro was required to show, with respect to the communication at issue, that it occurred in the course of an effort to obtain legal advice from a professional legal adviser acting in his capacity as such. *See United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961).[4] No such relationship was shown.

■ Martin testified that he told Demauro, at the outset of the interview, that he had been "retained" by Chemical "to represent it," and to conduct an investigation "for the bank" of the currency-exchanging that had allegedly occurred at various Chemical branches. Furthermore, he told Demauro that the bank expected its employees to cooperate in the investigation, and that if it were determined that an employee had lied in the course of the inquiry, the employee might be terminated.[5]

In the face of this direct testimony, defense counsel did not cross-examine Martin about any circumstance that might have led Demauro to believe that his interview with Martin had been a conversation with a lawyer representing him. Nor did Demauro so testify when he later took the stand. In view of the utter failure to establish the necessary elements of a privileged relationship, Judge Tenney properly overruled the objection and admitted the evidence.

■ Nor do we find any merit in Demauro's contention that the Supreme Court's decision in *Bronston v. United States*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), mandates reversal on the ground that his answers before the grand jury, however unresponsive and misleading, were literally true and hence not perjurious. Without analyzing here each question and answer forming the basis of Demauro's conviction, we are convinced from a careful review of the record that Judge Tenney correctly found that Demauro knowingly gave false testimony about material matters to the grand jury while under oath, as distinguished from answers that were unresponsive or untrue only by "negative implication." *Bronston v. United States, supra*, 409 U.S. at 361, 93 S.Ct. 595. The record shows that the grand jury was attempting to ascertain when Demauro learned that money-exchanging had occurred at Chemical branches. The evidence supports Judge Tenney's finding that "Demauro was informed of money washing as early as 1968 and thereafter on a number of occasions," despite his repeated and unequivocal claims to the contrary during his grand jury and trial testimony. The prosecutor's grand jury questioning was sufficiently precise and unambiguous, and Demauro's answers

---

4. In *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), we cited with approval Wigmore's famous formulation:

    (1) Where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 Wigmore, *Evidence*, § 2292 (McNaughton rev. 1961).

5. Soon after Martin's first interview with Demauro a second session was scheduled. The second interview was also attended by the executive vice president of Chemical. Shortly after this second interview, Demauro was terminated as a Chemical employee.

sufficiently unqualified, to render *Bronston* inapplicable. *See United States v. Bonacorsa,* 528 F.2d 1218 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976).

The conviction is affirmed.