**UNITED STATES of America**
v.
**E. BROOKE MATLACK, Inc.**
**Crim. A. No. 23711.**

United States District Court
D. Maryland, Criminal Division.
March 20, 1957.

Leon H. A. Pierson, U. S. Atty., James H. Langrall, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

Edwin A. Gehring, James J. Doherty, Baltimore, Md., for defendant.

CHESNUT, District Judge.

In this case the United States has filed a criminal information in 66 counts against the defendant alleging violations during October, November and December 1955 under section 322 of title 49 U.S.C.A., reading as follows:

"§ 322. Unlawful operation—(a) violation of chapter or rule or orders; penalty where none otherwise provided.

"Any person knowingly and willfully violating any provision of this chapter, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense."

The charge is that the defendant in each of the 66 counts failed to require the driver of its vehicle to file a daily log showing his activities during the day as required by and in accordance with regulations promulgated by the Interstate Commerce Commission and relating to interstate motor carriers.

The regulations are to be found in 49 C.R.F. ss. 190–196.

Section 195.8(a) reads as follows:

"(a) Every motor carrier shall require that a driver's daily log shall be made in duplicate by every driver employed or used by it and every driver who operates a motor vehicle shall make such a log. Form BMC–59 and the instructions for its use, which form and instructions are set forth below, shall be used for this purpose."

In the instructions referred to are those which require, among other things, (1) that the log shall contain a statement of mileage for the day; (2) shall show the trips made that day including origin and destination and (3) the hours of driving with notations as to the time off duty and on duty in driving; (4) drivers in general are not permitted to drive for longer hours than 10 hours in

a day of 24 hours nor more than 60 hours in a week.

In a previously reported opinion of this court dealing with the subject matter of proper compliance with the regulations as to logs, this court has held that the regulations are valid and has considered at some length in detail what the instructions require the driver to do in keeping a proper log. United States v. Reid, D.C.Md., 110 F.Supp. 253. In that case the driver was found guilty of failure to keep a proper log. The motor carrier was also charged as having aided and abetted the driver in non-observance; but as the evidence of violations related only to one particular trip, an isolated instance of non-compliance, the motor carrier was found not guilty of aiding and abetting.

The defendant does not dispute the fact that in each of the 66 counts the drivers' logs filed with the defendant failed to comply with one or more of the requirements; but contends that the failure of the defendant to require the filing of proper logs by its drivers was not due to "wilful and knowing conduct" on its part.

As a result of hearing extended testimony and argument occupying several days, I find the following principal and important points are established by the evidence.

1. The defendant is a Pennsylvania corporation having its principal business office in Philadelphia but operating its interstate transportation of petroleum and related chemical products from 27 branch terminals, one of which is at Baltimore, Maryland, and others in nearby States including Pennsylvania, New Jersey and Virginia. All the violations in this case arose from the conduct at the Baltimore terminal.

2. The vehicles used by the defendant consist of the well-known type of tractor-trailer. For their whole operation during 1955 the Company owned 144 tractors and operated 322 which were leased by it. Its gross revenue for 1955 was about $11,500,000. From the Baltimore terminal defendant operated 35 to 40 vehicles owned by it and 82 which were leased to it.

3. All the violations charged in this case related to insufficient logs filed by drivers of leased vehicles. The vehicles owned by the Company were driven by its directly employed drivers who were paid by the defendant. The drivers of the leased vehicles were either the owners thereof or employed by another trucking company. In both cases the leased vehicle was paid by a percentage of the transportation charge which varied from about 60 to 85% dependent on the circumstances. The tractors owned and operated by the defendant were equipped with an instrument known as a "Tachograph" on which was automatically recorded most of the information required by the instructions as to the proper contents of the drivers' logs. The leased vehicles were not equipped with this instrument. In general, it was more difficult for the defendant to enforce strict compliance by the leased drivers or operators with the instructions.

4. The course of business in the defendant's office at the Baltimore terminal was in general as follows. There was a branch manager and three despatchers and other clerical employees. The despatchers had the primary duty of giving orders to the drivers with respect to picking up and delivering loads, determining from the logs filed by different drivers when they were respectively eligible for continued work, with respect to their maximum permissible hours of service, and receiving from the drivers on their return from a trip the documents relating thereto including the driver's log, bills of lading as to particular shipments, and any other daily report made by the respective drivers. The despatchers had three shifts, eight hours each, from 12 midnight to 8 A.M., from 8 A.M. to 4 P.M., and from 4 P.M. to midnight. When drivers returned to the terminal in the afternoon their papers would be received by the despatcher then on duty but as he was frequently otherwise occupied he simply retained

them for further attention by the succeeding despatcher who, serving from midnight to 8 A.M. generally had more available time for attention to the papers. During the three months of 1955 here involved, the midnight despatcher was one Connor. In practice he made no comparison of the drivers' logs with the related papers which would indicate the trip or trips made by the driver. He only checked the log to compute from it the driver's stated previous hours of service to determine whether he was then or soon would be eligible for another trip. In many of the 66 counts here involved the driver's log purported to show that the driver was "off duty" during the whole day, when the bill of lading with respect to loading and deliveries filed with the log by the driver clearly showed at a glance that the driver had been on duty for a substantial time that day. In many of the 66 counts the logs were insufficient in that they did not show any mileage in the blank expressly and clearly provided therefor in the required form for the driver's log. With respect to other counts the log failed to show some of the trips which had been made by the driver on that day. Where some particular mileage was indicated a comparison of the logs with related papers would have shown the despatcher the insufficiency of the logs. Connor testified that he had received no particular instructions from the Baltimore terminal manager or from his (Connor's) immediate predecessor as despatcher to compare the log with the related papers. The local manager said that he had given the despatchers generally instructions to see that proper logs were filed. I find, however, that the manager did not himself periodically or regularly make any examination of the logs in comparison with related papers turned in by the drivers. Nor was there any other employee in the Baltimore branch who was required to make such a comparison. And during the period in question there was no systematic or regular inspection and examination of the Baltimore branch made by the General Manager of the defendant at its Philadelphia office. In other words, there was no sufficient check on the work of the despatchers.

5. The logs when given to the despatcher were put in and kept in a file separate and apart from the related papers as, for instance, the bill of lading, the latter being turned over by the despatcher to the clerical office force and from the data thereon there was compiled a so-called daily truck report which showed the whole activities of the branch transportation operations for the day. A comparison of this daily truck report with the logs would have readily disclosed the insufficiency of the logs in the 66 cases. The daily truck report and the related papers were duly sent to the Philadelphia office but the logs were retained in the Baltimore branch office.

6. The information in this case also charges that there was a former conviction in this court of this defendant on a similar charge, failure to require drivers to file proper logs, on June 29, 1949, in which case, as appears from the records of this court in Criminal No. 21633, the defendant pleaded guilty and was fined $10 on each of 20 counts, making a total fine of $200 and costs. Evidence was offered by the defendant from which I find in substance that after said prior conviction the defendant undertook to make corrections in its former practice with respect to requiring compliance by drivers with the filing of proper logs and in the course thereof the defendant discharged its former manager and despatchers at the Baltimore branch and gave general instructions to its new employees to require more strict compliance with the regulations respecting logs. A new terminal manager, Mr. Dinnell, was employed and new despatchers from time to time were engaged. Dinnell had been a driver for the Company and was personally familiar with the requirement as to the logs. From time to time when his attention was specifically called to an insufficient or incorrect entry on a driver's log, he required the particular driver to correct it but, as already stated, he made no

general check of the logs. He apparently did not consider that he was required to do so by the Philadelphia office. During the period here involved there was no one person in the defendant's organization charged specifically with the duty of affirmatively requiring compliance by drivers with the instructions as to the keeping of their logs and the full and proper entries thereon daily.

The defendant also established a so-called Cardex system. This contained a card for each of the drivers on which was listed his prior hours of driving for a particular period. The data was compiled from what appeared on the logs. If the logs were incorrect in stating the hours of driving, the driver's card in the Cardex file would likewise be incorrect.

The motive of drivers to understate their hours of driving was to enable them to obtain more assignments by the despatchers and thus enable the drivers to earn more compensation. And the motive of failing to list on the logs the mileage and omitting trips made had the effect of preventing the despatcher from computing the driver's time which, if it had been correctly stated, would have prevented his further assignment for work. As the leased drivers were not paid by the hour but directly or indirectly by a proportion of the freight charge, the defendant had no such direct motive as the drivers in accepting improper logs but, as is indicated by the large number of leased drivers during the period in question, it is inferable that the amount of transportation was comparatively great during that period and the need to get the work done and thus, of course, increase the business revenue, may have had the tendency to increased laxness in the supervision of the drivers' working time.

7. Defendant also offered satisfactory evidence to the effect (a) that during the period involved it had a good safety record for its operations, being less than the national average; (b) that the superior officers of the defendant in the Philadelphia office were surprised to find the extent of the numerous violations here admitted; (c) that although numerous as alleged, the percentage of insufficient logs was comparatively small when the total number of logs filed by the drivers in that period, several thousand at least, are considered.

8. The present case grows out of an investigation made by an Inspector from the Interstate Commerce Commission begun early in January 1956. There was also evidence that he found many additional violations with respect to insufficient logs during the three month period, making the total number 158 or more. After this investigation the defendant has made further and possibly and apparently more successful efforts to require full compliance by its drivers with respect to the daily logs; and to this end has appointed a Safety Inspector who now is entrusted directly with the duty of comprehensively overseeing, checking and insisting on full compliance by the drivers. Also four engineers are employed who habitually make checks on the drivers while on the road to see that they are observing the requirements.

■■ It seems obvious that the regulations with respect to the contents of the drivers' logs are very important provisions in the matter of safety on public roads. It is common knowledge that long continuous hours of driving by one person are apt to entail fatigue and tend to relax the kind of concentrated attention necessary in driving motor vehicles. It is also common knowledge that tractor-trailers are by their size and nature of operation vehicles which require careful experienced skill and attention in driving to avoid serious accidents. A tractor-trailer is usually a very large vehicle frequently about 40 feet in overall length, and when loaded often weighing 30,000 to 40,000 pounds, consisting of two separate parts, one the tractor and the other the trailer and connected together they are liable to "jackknife" unless carefully driven. The regulation requiring the logs to show total mileage, hours of driving and the particular trips

of themselves when properly and fully entered will tend to show whether the driver has complied with these safety requirements, and also whether, when the mileage is compared with the hours of driving, there has been proper compliance with the local road requirements as to maximum permissible speed.

As already stated, the defendant does not contest the fact as to the violations of the regulations appearing either on the face of the logs or when considered by comparison with the related papers. The defense is only that the defendant was not acting wilfully and knowingly in failing to require proper logs from the drivers. In deciding this question there are certain well established principles that must be borne in mind. In the first place there can be no doubt that the defendant motor carrier well knew what the regulations required with respect to the logs and knew the importance thereof in relation to safety requirement. Its attention had been very pointedly called to the subject and its duties with respect to it by virtue of the former prosecution. The meaning and effect of the word "wilful" depends upon the context in which it is used in a criminal or penal statute. United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Spies v. United States, 317 U.S. 492, at page 497, 63 S.Ct. 364, 87 L.Ed. 418; United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 S.Ct. 533, 82 L. Ed. 773. In the last cited case the opinion by Mr. Justice Butler said in 303 U.S. at pages 242–243, 58 S.Ct. at page 535:

> "Our opinion in United States v. Murdock, 290 U.S. 389, 394, 54 S. Ct. 223, 225, 78 L.Ed. 381, shows that it often denotes that which is 'intentional, or knowing, or voluntary, as distinguished from accidental,' and that it is employed to characterize 'conduct marked by careless disregard whether or not one has the right so to act.'"

And in the same opinion Mr. Justice Butler quoted with approval from an opinion of Mr. Justice VanDevanter, St. Louis & S. F. R. Co. v. U. S., 8 Cir., 169 F. 69, when, as Circuit Judge he was dealing with a similar case (a railroad's failure to water cattle in transportation), he said with regard to the meaning of the word "wilful"—

> " * * * 'we are persuaded that it means purposely or obstinately and is designed to describe the attitude of a carrier, who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements'."

In the context of the criminal statute involved in this case the word does not connote the existence of an evil motive as it does in some situations involving moral turpitude, as, for instance, in an attempt to wilfully evade the payment of income taxes and thus to cheat the government. See Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, supra. The statute in the present case does not create a crime of moral turpitude, such as were the well known felonies at common law, but enacts a new statutory requirement to be observed by interstate motor carriers in the interest of public safety.

Another important consideration is that this affirmative duty is required of a corporation. Section 195.8 of the regulations provides that—

> "Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. * * * Failure to make logs, failure to make required entries therein, falsification of entries, or failure to file logs with the motor carrier will make both the driver and the carrier liable to prosecution."

A corporation can act only through its agents. Knowledge of notice to an agent of a corporation acting within the scope of his authority is notice to the corporation. Where an affirmative duty to do something is imposed upon a corporation, it must be performed by some or several of its agents. Conscious disregard of or indifference to the performance of this

duty is, in my opinion, what amounts to wilful failure on the part of the corporation.

The position taken by counsel for the defendant seems to be that because the superior executives of the corporation in the Philadelphia office did not personally know or suspect that the corporation's agents in the Baltimore branch were disregarding the affirmative duty, therefore the corporation should not be held liable. I cannot agree to this view. While the primary responsibility for conducting the operations of the corporation lay with its principal officers, it was their duty in delegating authority to lesser agents to take effective measures to supervise and assure performance of the affirmative duty imposed upon the corporation. Thus the corporation cannot avoid responsibility by merely saying that a subordinate agent neglected his duty. The chief executive officer of the corporation in the Philadelphia office, Mr. Robert Matlack, candidly and succinctly said, when asked how the violations could have occurred without his knowledge, that somebody simply disobeyed instructions. The agents of the corporation at the Baltimore terminal neglected or failed to perform the duty imposed by the regulations on the corporation. On many of the 66 logs found deficient there was no entry at all as to the mileage of the vehicle. This was apparent on the face of the logs at a glance. In more cases, however, where the log omitted an essential requirement, its insufficiency became readily apparent if the related papers filed at the same time were compared. The opportunity to make this simple comparison first occurred with the despatchers and later when the daily truck report was made up by the clerical force in the Baltimore office a simple comparison of the data thereon with the daily log which was separately filed at the same office, would likewise have shown the insufficiency of the log.

The logs were kept in the Baltimore office and the related papers, including bills of lading and the daily truck report, were forwarded to Philadelphia evidently for the purpose of billing for the services performed. While the Philadelphia officers did not have the opportunity there to compare these documents with the bills of lading, it was their duty to the corporation to take effective measures to see that the subordinate agents in Baltimore were performing their duty in compliance with the statute.

The failure to perform this duty was not accidental or occurring in a few isolated cases only but in so many cases in a comparatively short period of time that it was consistent with the customary course of business.

On the whole evidence I conclude that the defendant's failure to require its drivers to file proper logs was "wilful and knowing". In my opinion the word "wilful" in this context has the same content and application as is given it in the opinion of Mr. Justice Butler in the case of United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 S.Ct. 533, and is also consistent with the reasoning in the more recent cases of Inland Freight Lines v. United States, 10 Cir., 191 F.2d 313, at page 315, Id., 10 Cir., 202 F.2d 169; and United States v. Pennsylvania Greyhound Lines, Inc., D.C.Pa., 85 F.Supp. 436.

In the Illinois Central case, the United States sued the Railroad for "wilful and knowing" failure to water cattle in transit. The Railroad's failure to water the cattle was attributable to negligent lack of cooperation between two of its agents. The statute involved was humanitarian in nature and similar in that respect to the public safety objectives of the statute in this case. It was held that the negligent failure of the agent of the corporation showed a careless disregard of a positive duty which amounted to wilfulness on the part of the corporate entity. While mere negligence of a particular agent would not be sufficient of itself to constitute a wilful mistake on his part, the situation is different when a corporation charged with an affirmative duty does not secure its performance by proper

agents, and where the failure is not merely accidental or individual but systematic and without justifiable excuse.

Counsel for the defendant relies upon St. Johnsbury Trucking Co., Inc., v. United States, 1 Cir., 1955, 220 F.2d 393, and United States v. Chicago Express Inc., 7 Cir., 235 F.2d 785. I have considered these cases which dealt with the application of the word "knowingly" under a different statute or different regulations but find that the situations on the facts are so different from those of the instant case that I do not feel they are controlling here.

As the case was tried without a jury I have, of course, carefully considered whether the evidence as a whole establishes guilt beyond a reasonable doubt as the meaning of that phrase is well understood in federal criminal law. I conclude that it does and therefore feel obliged to enter a verdict of guilty with respect to each and all of the 66 counts of the information.