**AERO MAYFLOWER TRANSIT COMPANY, INC., and Allied Van Lines, Inc., Petitioners,**

v.

**The INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents.**

**Nos. 75–1654, 75–1817.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1976 and Feb. 11, 1976.

Decided May 7, 1976.

---

James L. Beattey, Indianapolis, Ind., William F. Koegel, New York City, for petitioners.

Alan J. Thiemann, Hugh W. Cuthbertson, I. C. C., John H. D. Wigger, Dept. of Justice, Antitrust Div., Washington, D. C., for respondents.

Before TONE and BAUER, Circuit Judges, and HOFFMAN, Senior District Judge.*

JULIUS J. HOFFMAN, Senior District Judge.

These cases are before us on the respective petitions of two nationwide carriers, Aero Mayflower Transit Company, Inc. (Mayflower), and Allied Van Lines, Inc. (Allied), for review of orders of the Interstate Commerce Commission suspending their authority to transport certain household goods. Imposed as penalties for violations of prior suspension orders, the suspensions, which have been stayed pending review, are for 30 days in the case of Mayflower and 15 in the case of Allied. The petitioners do not, in substance, deny the facts asserted against them. The sole question presented is whether these facts constitute "willful" violations under § 212(a) of the Interstate Commerce Act, 49 U.S.C. § 312(a), which authorizes the Commission to revoke or suspend the transportation privileges of carriers for willful violations of the Act or Commission rules and orders.

The prior suspension orders grew out of Commission efforts to enforce consumer-oriented regulations promulgated by the Commission in 1970. Known to the industry as the "Household Goods" regulations, these regulations, 49 CFR §§ 1056 *et seq.*,

---

* The Honorable Julius J. Hoffman of the Northern District of Illinois is sitting by designation.

contain rules regarding the establishment of rates and disclosure of information to the shipper, and require, *inter alia*, transportation with "reasonable dispatch" of the goods accepted by carriers for shipment. In 1972, the Commission initiated, pursuant to statutory authority, a series of hearings to determine whether petitioners and other carriers had complied with the regulations. The proceedings as to both Mayflower and Allied were resolved by settlement in which the respective carriers admitted certain facts and agreed to 15-day suspensions of their authority to transport "proviso (2)" commodities, a class of household goods that includes, *inter alia*, office furniture.[1] The Mayflower suspension was to run from December 1, 1972, to December 15, 1972; the Allied suspension from January 15, 1973, to January 30, 1973.

After these initial suspension periods expired, the Commission initiated further investigations to determine whether petitioners had complied with the terms of the suspension orders. A computer print-out of 3100 Mayflower shipments between November 24, 1972, and December 22, 1972, disclosed 34 "apparent violations" to Commission investigators. Mayflower admitted the facts constituting 22 of these. The proceedings were thereupon reopened, and Administrative Law Judge George P. Morin found the 22 violations to be "willful" under § 212(a) of the Interstate Commerce Act. Accordingly, he imposed a second 15-day suspension. The Commission, Division 1, not only affirmed the decision of the ALJ, but also extended the suspension to 30 days.

The investigation of Allied produced 14 "apparent violations" from a computer record of 6,820 shipments. Allied admitted the facts constituting 13 of the asserted violations. After hearing evidence, Administrative Law Judge Alvin H. Schutrumph concluded that the 13 violations were not "willful" under § 212(a) of the Interstate Commerce Act. Upon exceptions taken by the Interstate Commerce Commission Bureau of Enforcement, the Commission, Division 1, reversed the decision of the ALJ and imposed a 15-day suspension of Allied's proviso (2) authority, even though it adopted the findings of the ALJ. In both the Mayflower and Allied cases, the Commission denied petitions for reconsideration and granted stays of the suspensions pending review in this court.

Section 212(a) authorizes the suspension or revocation of the certificate, permit, or license of a carrier upon a showing of "willful failure to comply with any provision of this chapter, or with any lawful order, rule, or regulation of the Commission promulgated thereunder, or with any term, condition, or limitation of such certificate . . . ." While no definition of "willful" appears in the Interstate Commerce Act, in *United States v. Illinois Central R.R. Co.*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1939), the Supreme Court construed "willfully" in the context of a statute similar to § 212(a). *Illinois Central* was an action by the United States to recover a penalty assessed against a railway carrier for violations of the Cruelty to Animals Act, 45 U.S.C. §§ 71–74. Under that statute, no carrier is permitted to confine cattle in railroad cars for longer than 28 hours without unloading them for rest, water and feeding, unless the period is extended to a maximum 36 hours upon written request of the owner. Any railroad "knowingly and willfully" violating these provisions is subject to the payment of a fine of not less than $100.00 nor more than $500.00. In *Illinois Central*, the respondent admitted the facts asserted against it. The sole question presented, therefore, was whether the carrier had "knowingly and willfully" violated the Cruelty to Animals Act.

According to the Court, which actually adopted *in haec verba* the definition fashioned by then Circuit Judge Van Devanter in *St. Louis & S. F. R. Co. v. United States*,

---

1. "Proviso (2)" commodities are listed in the regulation as follows:

    '(2) furniture, fixtures, equipment, and the property of stores, offices, museums, institutions, hospitals, or other establishments,

when a part of the stock, equipment, or supply of such stores, offices, museums, institutions, hospitals, or other establishments.'
49 CFR § 1056.1(a)(2).

169 F. 69, 71 (8th Cir. 1909), "willfully" means

> ". . . purposely or obstinately and is designed to describe the attitude of a carrier, who, having a *free will or choice,* either intentionally disregards the statute or is plainly indifferent to its requirements."

*United States v. Illinois Central R.R. Co.,* 303 U.S. at 243, 58 S.Ct. at 535, 82 L.Ed. at 777. There was no question in that case that cattle transported by respondent had been continuously confined for one hour beyond the 36 hour limit. Respondent's New Orleans yardmaster, who had been informed in advance as to the arrival of the cattle and the appropriate hour for their unloading, negligently failed to notify an employee whose duty it was to carry out the unloading. Although the yardmaster had actually obtained an extra engine and crew for transporting the cattle to the stockyards, the court found that the failure of the respondent to remove the cattle, which had been brought to the yard for unloading, unquestionably disclosed a disregard of the statute and indifference to its requirements. Accordingly, the Court concluded that respondent had knowingly and willfully violated the statute. In the opinion by Justice Butler, the Court recognized its obligation "to give effect to the humanitarian provisions of the statute," and pointed out that as between the government and the respondent, the statutory breach was "precisely the same in kind and degree as it would have been if its yardmaster's failure had been intentional instead of merely negligent." 303 U.S. at 244, 58 S.Ct. at 535, 82 L.Ed. at 777.

■ As a matter of law, it is clear that a criminal intent to commit an act known to be wrongful is not necessary to establish willfulness in a civil context. As the *Illinois Central* Court observed,

> "[i]n statutes denouncing offenses involving turpitude, 'willfully' is generally used to mean with evil purpose, criminal intent or the like [b]ut in those denouncing acts not in themselves wrong, the word is often used without any such implication."

303 U.S. at 242, 58 S.Ct. at 535, 82 L.Ed. at 777.

Here, the Commission contends that all that is required under *Illinois Central* is a general intent to perform the act constituting the violation. In its view, an act that is a product of "free will" is "willful" for purposes of § 212(a). Presumably, free will denotes the absence of compulsion.

On the other hand, Allied in particular asserts that the appropriate meaning of "willful" lies between criminal intent and the "free will" standard urged by the Commission. Something more than "free will" must be shown, petitioners suggest, if the word "willful" in § 212(a) is to be given any effect. In relying on the "free will" language of the *Illinois Central* definition, the petitioners contend the Commission ignores the "intentionally disregard," and "plainly indifferent" elements of it.

■ *Illinois Central* holds that a merely negligent violation, as well as an intentional one, will support a finding of willfulness. Yet, in reaching this result, the Court remarked that a penalty "is not imposed for unwitting failure to comply." 303 U.S. at 242, 58 S.Ct. at 534, 82 L.Ed. at 776. From this it follows that an element of culpability is necessary to establish a "willful" violation. Thus, when the yardmaster neglected to notify the employee whose duty it was to unload the cattle, he demonstrated the "plain indifference" referred to by the Court in its definition. The failure of the yardmaster could not have been "unwitting," for he had arranged for an extra engine and crew for the purpose of complying with the statute.

The position of the Commission in these cases is the same as that of the government in *St. Louis & S. F. R. Co. v. United States, supra,* the action under the Cruelty to Animals Act in which Judge Van Devanter laid down the definition of "willfully" ultimately adopted by the *Illinois Central* Court. There, he declared that "the government seems to have proceeded as if the qualifying words 'knowingly and willfully' were not in the penal section." 169 F. at 72.

That position is as incorrect now as it was then. Liability under § 212(a) is not strict, else there would be no room in the statute for "unwitting" failures. If Congress intended that every civil violation of the Interstate Commerce Act, or the Commission rules or orders, would activate Commission powers of revocation and suspension, regardless of fault, it would not have drafted "willful" into the statute.

Erroneously, therefore, the Commission has applied a standard that admits absolutely no deviation from the terms of the prior suspension orders. It is true that these orders suspended "any and all" transportation of proviso (2) commodities. Section 212(a), however, provides for revocation or suspension on proof of willful violations only. In the case of Mayflower, the suspension under review was imposed on the basis of 22 violations out of 3100 shipments. The ratio of compliance was, therefore, greater than 99%. Eighteen of the 22 violations arose out of what we interpret as a mutual misunderstanding as to the so-called "in-transit" privilege, i. e. the right of the carrier to deliver to destination, during the suspension period, goods loaded prior thereto. In other words, Mayflower officials understood that the suspension order prohibited *loading only* of proviso (2) commodities during the period prescribed. On August 29, 1972, three months before the suspension was to begin, John B. Smith, the president of Mayflower, by letter advised all of its agents that they could not *load* proviso (2) commodities during the suspension.

While there is no suggestion in the order of suspension as to any such in-transit privilege, Mayflower insists that Commission attorney, John J. Charuhas, Chief of the Administrative Proceedings Branch of the Bureau of Enforcement, represented to Mayflower in the initial settlement negotiations that the in-transit privilege would obtain. Although the Commission suggests that the representation was not made at the instance of the Director of the Bureau of Enforcement, it never disavowed the representation of Charuhas. Even without the

representation, Mayflower could have reasonably assumed that the in-transit privilege would obtain, for if it were prohibited from delivering, during the suspension, certain of the goods loaded prior to its inception, it would be in the anomalous position of violating the "reasonable dispatch" provisions in the Household Goods Regulations, which require "performance of transportation" during or on the dates agreed upon by the shipper and carrier. 49 CFR §§ 1056.-1(a), 1056.12. Moreover, while it is clear that the suspension order contains no language respecting an in-transit privilege, neither does it contain language requiring Mayflower to "off-load" the proviso (2) goods at a warehouse and proceed to "deliver-out" other goods in the same shipment. Furthermore, if the suspension order were applicable to goods loaded prior to the effective date, as a practical matter the suspension period would extend beyond 15 days. When this mutual misunderstanding as to 18 of the 22 violations is thus amplified, the absence of willfulness as to them becomes clear. The yardmaster in *Illinois Central* failed negligently to do what he knew was required to meet the applicable statutory requirements. The agents who "delivered out" their shipments relied on directions from corporate headquarters, which in turn had relied on a Commission bureau chief. In the language of *Illinois Central*, the transgressions of Mayflower were "unwitting" failures to comply with the suspension order.

The overwhelming fact is that out of 3100 shipments across the country, the Commission could find only 22 violations. Unlike the situation in *Illinois Central*, which was a proceeding to recover a penalty imposed for a single negligent violation, the Mayflower suspension arises out of an investigation of nationwide scope. The Mayflower record discloses no failures that are "systematic and without justifiable excuse," as in *United States v. E. Brooke Matlack, Inc.*, 149 F.Supp. 814 (D.C.Md. 1957), nor a "continued failure even after admonition . . . to move satisfactorily toward full compliance with the safety regulations." *Safeway Truck Lines, Inc.*,

No. MC–C–2139, 77 MCC 443 (1958). We cannot say that Mayflower was "plainly indifferent" to the suspension order when it managed over 99% compliance therewith, when out of 3100 shipments only 22 moved in violation of the order, and eighteen of the 22 violations arose out of a mutual and reasonable misunderstanding as to which shipments the order applied.

Allied presents a record that is even stronger than that of Mayflower. In the Allied proceeding, the Commission could find only 13 violations out of 6,820 shipments. Again, the percentage of compliance was over 99%. As in the Mayflower case, Allied originally perceived that an in-transit privilege would apply. Accordingly, in a letter dated January 5, 1973, the day after the suspension order was served, Robert S. Reis, Chairman of the Board of Directors of Allied, advised all agents that they could not *load* proviso (2) commodities during the suspension period. The ALJ found that Reis' interpretation of the order was based on a discussion between the Vice-President and General Counsel of Allied, James W. Tallant, and the Assistant Director of the Bureau of Enforcement, John H. O'Brien, who assured Tallant on January 5, 1973, that the in-transit privilege would obtain. Three days later, however, O'Brien advised Tallant that the Director of the Bureau of Enforcement, Bernard Gould, could not concur in this interpretation and that it was incorrect. On the following day the Director, after talking with Commissioner Murphy, himself advised Tallant that the suspension order precluded transportation of proviso (2) goods loaded prior to the beginning of the suspension period. With only six days, which included a weekend, remaining until the first day of the suspension, Tallant instructed all of the Allied agents, by letter, of the revised interpretation of the order. The ALJ found generally that "various actions taken during the period after issuance of the order of January 3, showing respondent's attempts to insure compliance therewith are of record."

The facts comprising the asserted violations suggest even more forcefully the absence of willfulness. For example, one shipment arrived in Pittsburgh on a Sunday, January 14, 1973. Unable to unload the goods on that day because the warehouse was closed, the driver unloaded them early Monday morning, before the Tallant letter advising of the revised interpretation arrived at the warehouse. The revenue from the shipment was $791.14. The driver, moreover, had been caught in a snowstorm for four days en route to Pittsburgh. Another shipment to St. Petersburg, Florida, was delayed due to repairs which were completed on Friday, January 12. Delivery was made the following Monday, the first day of the suspension. Still another driver faced a closed office of a consignee on Saturday, January 13, in Cincinnati, and was unable to make delivery until the following Monday. These circumstances, considered with the efforts of Allied to notify all agents of the revised interpretation of the in-transit privilege compel us to conclude that the 13 violations of Allied were not "willful" within the meaning of that term as it is used in § 212(a). We cannot say, as did the Commission, that Allied was "plainly indifferent" to the requirements of the order, when out of 6,280 shipments, Allied committed only 13 transgressions attributable to snowstorms, repairs, office hours of consignees and mutual misunderstanding as to the in-transit privilege. The record of Allied demonstrates affirmative effort, not plain indifference.

We recognize the obligation of the Commission to enforce the regulations it promulgated in the public interest. It is worth pointing out, however, that the public interest is not served by unwise use of suspension power. Here, the suspensions imposed would deprive consumers of services they need. The Commission interpretation as to the so-called in-transit privilege worked against provisions in the regulations it sought by these proceedings to enforce. Considered against the array of shipments, the violations asserted were *de minimis*. In both cases, we set aside the orders of the Commission.

So ordered.

TONE, Circuit Judge (concurring in part, dissenting in part).

While I agree with the statement of the meaning of the statutory term "wilfulness" set forth in the majority opinion and with the disposition of the *Allied* case, I am unable to agree with the disposition of the *Aero Mayflower* case. In my opinion, the Commission could properly find certain violations by Aero Mayflower. I agree that reliance by Aero Mayflower upon Bureau of Enforcement Counsel Charuhas' interpretation of the suspension order was justifiable. The ALJ's rejection of the reliance argument was based, not on evidence that no such interpretation was given, of which there was none, but upon his own view that no attorney employed by the Bureau of Enforcement would ever utter such an interpretation. Yet ICC's failure to call Charuhas to rebut the evidence or otherwise to dispute it and Aero Mayflower's bulletins sent to its agents *ante litem motam* stating that proviso (2) commodities could not be "loaded" during the suspension period strongly suggest the contrary. Moreover, an interpretation to the same effect as that allegedly given by Charuhas was admittedly given by the Assistant Director of the Bureau of Enforcement to Allied Van Lines officials, and confirmed by members of the Assistant Director's staff, although that interpretation was later countermanded by the Director of the Bureau. It is fairly obvious that the interpretation Charuhas was said to have given represented a view held by some members of the Bureau. Accordingly, the ALJ's rejection of the claim of reliance on Charuhas' interpretation, which was not based on impressions of demeanor testimony but on a supposition which is plainly wrong, should not bind us.

The ALJ also found, however, that only 14 of the 22 alleged violations showed pick-up dates prior to the commencement of the suspension period, with delivery dates falling within it. Thus, while I agree that the Commission has failed to prove an "intentional disregard" of, or "plain indifference" to, the order with respect to the fourteen shipments, eight are not covered by the reliance defense. Of these eight, according to the ALJ's findings, four were picked up and placed in storage before the suspension period, and then loaded onto Aero Mayflower's line-haul equipment and delivered within the period. The other four apparently were both picked up and delivered within the suspension period. All eight shipments could properly have been found to have been in violation of the suspension order. Because Aero Mayflower is guilty of only eight violations, rather than 22, remand to the Commission, for a reassessment of the penalty would be appropriate.

While I am not unsympathetic to the majority's view that so small a proportion of violations out of a total of 3100 shipments is *de minimis*, we do not have the authority, in my opinion, to impose a *de minimis* standard on the Commission. Even a single violation among many transactions conducted in compliance with the law may be punished by the Commission, as *United States v. Illinois Central R.R.*, 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1939), illustrates. Imposing a second suspension on the carrier for these isolated violations of an order which the carrier's management appears to have made a good-faith attempt to obey may seem pointless and petty, but I think the Commission has authority to do it.

Also, I am unable to agree with two propositions stated in the majority's analysis of the Commission's interpretation of the suspension order. The "reasonable dispatch" requirement is not, in my opinion, inconsistent with a prohibition against delivering out during the suspension period goods loaded before the period commenced. The regulations, 49 C.F.R. §§ 1056.1(a) and 1056.12, require only that the carrier deliver the goods shipped within the time agreed upon between the shipper and the carrier, who, knowing the terms of a suspension order, must avoid making commitments that cannot be met without violation of the order. In addition, I do not think that the Commission's interpretation of the suspension order as forbidding delivering out during the period has the effect of lengthening

the period, any more than a contrary interpretation would have the effect of shortening it. The question is merely what activities are forbidden during the period. The Commission's ultimate interpretation of the suspension orders in the two cases was therefore, in my opinion, a permissible one.