ALABAMA POWER COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 77-2796.

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1978.

Robert McD. Smith, Lewis W. Page, Jr., Birmingham, Ala., George F. Bruder, Washington, D. C., for petitioner.

Howard E. Shapiro, Sol., FERC, Philip R. Telleen, Atty., Drexel D. Journey, Gen. Counsel, FERC, M. Frazier King, Jr., Washington, D. C., for respondent.

Before BROWN, Chief Judge, and RONEY and HILL, Circuit Judges.

RONEY, Circuit Judge:

Alabama Power Company petitions for review of a $1,000 forfeiture imposed by the Federal Energy Regulatory Commission for failure to report the commencement of repairs of a 1972 slide on the Walter Bouldin Dam, a licensed hydroelectric development on the Coosa River. 16 U.S.C.A. § 825n(a).[1] Holding the record does not support a finding that the failure to report was "willful" within the terms of the Federal Power Act, we set aside the order.

The Commission action leading to the forfeiture under review was triggered by a breach in the dam that occurred on February 10, 1975. The 1975 breach extended horizontally approximately 300 feet along the eastern embankment from the east face of the concrete intake structure and vertically downward 165 feet. The reservoir was entirely emptied and an interconnected reservoir lowered. Although Alabama Power lost 225,000 kilowatts of generating capacity, the dam's failure caused no personal injury or property damage except that sustained by the dam itself.

Within 10 days, the Commission instituted a formal inquiry into the cause of the failure. The investigatory portion of the inquiry lasted approximately one year and resulted in the submission of three separate reports: by the Atlanta Regional Office of the Federal Power Commission [now the Federal Energy Regulatory Commission], the Commission's Bureau of Power, and a Board of Inquiry of Alabama Power. The two reports produced by the Commission's agencies indicated that a serious contributing factor to the 1975 slide was the improper diagnosis and repair of a prior slide which had occurred in October 1972. The Alabama Power Board of Inquiry, on the other hand, concluded that the probable

1. 16 U.S.C.A. § 825n(a) provides that

Any licensee or public utility which willfully fails, within the time prescribed by the Commission, to comply with any order of the Commission, to file any report required under this chapter or any rule or regulation of the Commission thereunder, to submit any information or document required by the Commission in the course of an investigation conducted under this chapter, or to appear by an officer or agent at any hearing or investigation in response to a subpoena issued under this chapter, shall forfeit to the United States an amount not exceeding $1,000 to be fixed by the Commission after notice and opportunity for hearing. The imposition or payment of any such forfeiture shall not bar or affect any penalty prescribed in this chapter but such forfeiture shall be in addition to any such penalty.

cause of both the 1975 and 1972 slides was the failure to meet embankment specifications during construction.

When the reports were completed, a hearing commenced in May 1976. At the close of the June 17, 1976 session, the administrative law judge requested the Commission staff to submit its statement of position at the next and final session which had been scheduled for June 30, 1976. In the report submitted, the staff noted a failure on the part of Alabama Power to report the October 1972 failure promptly in violation of its license and the Federal Power Act. Concluding that the 1972 failure and its inadequate repair was "a strong and contributing factor" in the 1975 failure, the staff recommended a forfeiture of $1,000 under 16 U.S.C.A. § 825n(a). The administrative law judge rejected the forfeiture recommendations. Upon exception, the Commission reviewed the decision and reversed the administrative law judge regarding the forfeiture, holding that Alabama Power had willfully failed to report the 1972 slide and its repair as required by its license. Request for rehearing was denied. Alabama Power petitions for review.

Much has been argued in the briefs and at oral argument that should not control the outcome of this case. That the commencement of repair should have been reported can be assumed without decision on the point. That the purposes of the Act might be better carried out if the company could be penalized for mere failure to report can be assumed. That the congressionally required "willfully" does not rise to the level of criminal conduct can be assumed. But that Congress intentionally used the word "willfully" in the statute giving the Commission authority to penalize and that the word requires something more than mere failure to report must also be assumed.

The decision turns on the legal decision as to what "more than mere failure" must be shown to rise to the level of the statutorily-required "willfulness" and the factual determination of whether substantial evidence supports the finding that "more than mere failure" occurred.

■ 16 U.S.C.A. § 825n(a) provides a civil forfeiture by "[a]ny licensee or public utility which willfully fails . . . to file any report required under this chapter or any rule or regulation of the Commission thereunder, . . ." While the standard of willfulness in a civil case is distinct from the "bad purpose" requirement of criminal cases, see *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), it means something more than a mere failure to report. The term "willful" is not defined in the Federal Power Act. No judicial definition has been given in cases under this Act.

Faced with a similar problem in construing a section of the Interstate Commerce Act, the court in *Aero Mayflower Transit Co. v. ICC,* 535 F.2d 997, 999–1001 (7th Cir. 1976), turned to the language adopted by the Supreme Court in *United States v. Illinois Central Ry.,* 303 U.S. 239, 58 S.Ct. 533, 82 L.Ed. 773 (1938) (action against a railway carrier for violations of the Cruelty to Animals Act, 45 U.S.C.A. §§ 71–74). The Court there held that "willfully" means

> purposely or obstinately and is designed to describe the attitude of a carrier, who, having a free will or choice, either intentionally disregards the statute or is plainly indifferent to its requirements.

303 U.S. at 243, 58 S.Ct. at 535, *quoting* Judge Van Devanter's remark in *St. Louis & S.F. Ry. v. United States,* 169 F. 69, 71 (8th Cir. 1909). Liability was imposed in *Illinois Central* for mere negligence on the part of the railroad's employees. Nevertheless, the Court remarked that a penalty "is not imposed for unwitting failure to comply . . . ." 303 U.S. at 242, 58 S.Ct. at 534. In *Aero Mayflower,* the court was confronted with a situation where two moving companies were charged with violations of a suspension order. It held that the apparent violations were largely the result of a mutual misunderstanding and, when viewed in the context of the overwhelming evidence of compliance with the order, were not willful. It thereby concluded that the element of culpability necessary to constitute a "willful" violation was lacking.

Treating "willfully" as necessitating evidence of an intentional disregard of the reporting requirement or a plain indifference to it, an examination of the record as a whole sustains the decision of the administrative law judge and requires a reversal of the Commission.

Two facts are decisive: the uncertainty of the requirement to report, and the lack of any evidence that the company, or anyone in it, was indifferent to its reporting responsibilities.

The first difficulty comes from the lack of clarity as to whether the "commencement of repairs" had to be reported. The Commission itself concedes that, oddly enough, the slide itself did not have to be reported. Presumably, then, if the slide had never been repaired, there would be no violation of the reporting requirement as to the "commencement of repairs."

The Commission relied upon three documents which, it maintains, unambiguously sets forth the requirement to report the repair of slides such as the 1972 slide. (1) Article 4 of the license issued by the Commission requires that the Regional Engineer be furnished with "such information as he may require" concerning, among other things, maintenance of the project.[2] (2) The Regional Engineer's letter of April 17, 1964 provides that "[i]mmediate notification is requested on any development which could have an effect on the safety of project structures, and on any other matter of concern which requires prompt remedial measures." (3) The regulations of the Federal Power Commission require that licensees must report conditions of concern regarding the safety of any project. 18 C.F.R. § 12.3 (1977).[3]

The Commission, interpreting these documents, concluded that the duty to report a situation such as the 1972 slide should have been apparent. It reasoned that the 1972 slide involved the initiation of a maintenance operation differing in scope from ongoing maintenance operations. Moreover, the evaluation of the seriousness of the 1972 slide, although it erroneously determined the damage to be surficial, did result in prompt remedial measures within 10 days, namely, hand tamping clay against the 6 to 8 sheets of exposed steel piling to form a water seal and the dumping of 600 tons of crushed stone and 950 tons of riprap. The Commission distinguished the 1972 slide from a 1971 slide and a 1973 slide, as to which no report would be required, on the grounds of potential danger to the structural integrity. The latter two slides were, in its opinion, clearly not of the type that could affect the integrity of the dam whereas the former slide could have affected the dam and arguably did.

The interpretation given these requirements by the Commission itself in practice has been less than straightforward. The Regional Engineer's office had never sought notification of routine operation and maintenance activities. At the annual in-

2. Article 4 of the license provides:

*Article 4.* The construction, operation, and maintenance of the project and any work incident to additions or alterations, whether or not conducted upon lands of the United States, shall be subject to the inspection and supervision of the Regional Engineer, Federal Power Commission, in the region wherein the project is located, or of such other officer or agent as the Commission may designate, who shall be the authorized representative of the Commission for such purposes. The Licensee shall furnish to said representative such information as he may require concerning the construction, operation, and maintenance of the project, and of any alteration thereof, and shall notify him of the date upon which work will begin, and as far in advance thereof as said representative may reasonably specify, and shall notify him promptly in writing of any suspension of work for a period of more than one week, and of its resumption and completion. The Licensee shall allow him and other officers or employees of the United States, showing proper credentials, free and unrestricted access to, through, and across the projects lands and project works in the performance of their official duties.

3. 18 C.F.R. § 12.3 Additional inspections.

When an inspection by the licensee or the Commission's staff reveals conditions of concern regarding the safety of any project structure or the operation of the project works, the licensee shall cause such additional inspection and investigation to be made as may be found by the Commission to be warranted under the circumstances.

spection following the 1972 slide, Alabama Power reported its occurrence orally and Inspector Askew was advised of the repair. He expressed no complaint that prior notice had not been given to his office. His report stated that "[t]he licensee is complying with the requirements of the license with respect to maintenance [and] operation . . . and with respect to all other provisions of the license. . . . No unusual repairs were made during the inspection period. . . ."

Nevertheless, giving the Commission's determination of the meaning of its regulations the weight to which it is entitled upon review, we accept the interpretation accorded the regulations by the Commission. *Dart Transit Co. v. United States,* 567 F.2d 818, 820 (8th Cir. 1977); *Andrew G. Nelson, Inc. v. United States,* 355 U.S. 554, 558, 78 S.Ct. 496, 2 L.Ed.2d 484 (1958).

■ While we sustain the Commission's interpretation, that interpretation cannot fairly be given retroactive effect as if the standards were then clearly applicable. At best, there is some doubt as to the requirement of a prior report for a slide such as occurred in 1972. When viewed in the context of the overall compliance of Alabama Power, the Commission's own reactions, and the reasonableness of Alabama Power's judgment regarding the seriousness of the 1972 breach, it cannot be said that the company should have known of the requirement, there being no evidence that anyone in the company thought that the report was required. Thus, there is no support for a decision that there was an intentional disregard of the requirement. *Cf.* Cases decided under the Fair Labor Standard Act: *Brennan v. Heard,* 491 F.2d 1 (5th Cir. 1974) (violation willful where employer knew or had reason to know its conduct was gov-

erned by unambiguous provision of Act and evidence showed reason to know applicability); *Brennan v. J. M. Fields, Inc.,* 488 F.2d 443 (5th Cir. 1973), *cert. denied,* 419 U.S. 881, 95 S.Ct. 146, 419 U.S. 881 (1974) (defendant knew of applicability of unambiguous provision of Act); *Coleman v. Jiffy June Farms, Inc.,* 458 F.2d 1139 (5th Cir. 1971), *cert. denied,* 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972) (violations willful when substantial evidence supported finding that employer knew or suspected that his action violated Act notwithstanding reliance on advice of counsel). *See also Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 459–462 (D.C. Cir. 1976), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978) (employer's noncompliance willful when "he is cognizant of an appreciable possibility that he may be subject to the statutory requirements and fails to take steps reasonably calculated to resolve the doubt.").

While the standard adopted in *F. X. Messina Construction Corp. v. OSHRC,* 505 F.2d 701, 702 (1st Cir. 1974) (decided under Occupational Health and Safety Act), of "a conscious, intentional, deliberate, voluntary decision, which, regardless of a venial motive, properly is described as willful" is urged by the Commission, the result in that case is distinguishable because the defendant "was obviously aware" of the unambiguous requirements and had been previously convicted of a violation.

The evidence likewise fails to support an indifference to reporting requirements. It is clear from the testimony of Inspectors Goldwasser and Askew that the repair of slides was considered to be routine maintenance not requiring notice prior to repairs when they did not affect the safety and adequacy of the embankments.[4] Alabama

---

4. Excerpt from the testimony of Mr. Goldwasser:

> Q Was there any discussion about the reporting responsibilities of the licensee with regard to slides?
> A There are no instructions, except a slide is something that an inspector is interested in. This particular slide, I think you are referring to, happened in 1971 shortly

after the dam was completed. It was on the west dike about half way from the intake structure to the end of the west dike, and it was on the down stream side, and it was fairly high. It was a shallow slide, and having seen slides on other dams I did not consider it other than a regular maintenance job. I did not take a picture of it, I did not include it in my report.

Power reported the 1972 slide at the next annual inspection. There is evidence that the Company thought it was making all the reports required and no evidence that it was indifferent to its responsibilities.

PETITION FOR REVIEW GRANTED. ORDER SET ASIDE.

Q  When you say no instructions, what do you mean by no instructions?

A  I don't know of any orders that the Commission has issued stating—the only orders I know is the license, and the license, this particular license, did not contain any such orders.

Q  Such orders for what?

A  For them to furnish me specifications, or—

Q  We are talking about the reporting of slides. Are you following what we are talking about?

A  I understand now what you are saying. The Commission had issued general orders asking the licensee, or directing the licensee to report any condition that [required] maintenance of a serious nature  .   .  ..